MICHAEL N. FEUER, City Attorney
DAVID J. MICHAELSON, Chief Assistant City Attorney
TAYLOR C. WAGNIERE, Deputy City Attorney (SBN 293379)
PATRICK HAGAN, Deputy City Attorney (SBN 266237)
KABIR CHOPRA, Deputy City Attorney (SBN 285383)
221 N. Figueroa St., Suite 1245
Los Angeles, California 90012
Telephone: (408) 616-0621
patrick.hagan@lacity.org

Attorneys for Defendants
CITY OF LOS ANGELES, which includes
LOS ANGELES DEPARTMENT OF CANNABIS
REGULATION; AND MICHELLE GARAKIAN,
in her official capacity

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VARISCITE, INC. AND KENNETH GAY, <br><br>         Plaintiffs, <br><br>      v. <br><br> CITY OF LOS ANGELES; LOS ANGELES DEPARTMENT OF CANNABIS REGULATION; AND MICHELLE GARAKIAN, <br><br>         Defendants, | Case No.: 2:22-cv-08685-SPG-SK <br><br> Hon. Sherilyn Peace Garnett <br><br> **OPPOSITION TO APPLICATION FOR TEMPORARY RESTRAINING ORDER** <br><br> [Filed concurrently with: <br> (1) Request for Judicial Notice; <br> (2) Declaration of Jason Killeen; <br> (3) Declaration of Jesse Frierson] |

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................9

II. FACTUAL SUMMARY ......................................................................................10

    A.  The City's Social Equity Program. ...........................................................10

    B.  The SEIA Verification Process. ................................................................10

    C.  The Phase 3 Retail Round 2 ("P3RR2") Lottery. ..................................11

    D.  PCN Process. .............................................................................................12

    E.  Kenneth Gay's SEIA Application and Complaint. ...................................12

III. LEGAL STANDARD ..........................................................................................13

IV. ARGUMENT ......................................................................................................13

    A.  Plaintiffs Are Unlikely to Succeed on the Merits. ...................................13

        1.  The Ninth Circuit Has Not Applied the Dormant Commerce Clause to Cannabis Regulations. ......................................................14

        2.  Requiring the City to Accept Out-of-State Convictions Would Incentivize Criminal Conduct in Other States and Violate the Controlled Substances Act. .............................................................18

        3.  The City's Social Equity Program Does Not Exclude Out-of-State Applicants or Otherwise Burden Interstate Commerce. .........................19

        4.  Plaintiffs Do Not Have Standing to Challenge the City's Social Equity Program. ...........................................................................22

            a.  Mr. Gay Failed to Submit Sufficient Documentation of Any Qualifying Conviction, Regardless of Where it Occurred. ......23

            b.  Mr. Gay Failed to Fully Disclose His Assets and Income, Disqualifying Him as a Low-Income Applicant. ...........................23

| | | c. | Mr. Gay Failed to Submit Sufficient Documentation of 10 Years' Residence Anywhere, Regardless of Whether that Residence was in a DIA............................................................24 |
| | B. | Plaintiffs Are Unlikely to Suffer Irreparable Harm.............................25 |
| | C. | The Balance of Equities Tips Heavily Against a TRO. .........................26 |
| | | 1. | Halting the P3RR2 Lottery Would Harm the Other 508 License Applicants...............................................................27 |
| | | 2. | Plaintiffs' Delay in Filing Precludes Emergency Injunctive Relief..29 |
| | D. | A TRO is Not in the Public Interest. .....................................30 |
| | E. | If a TRO Must Issue, It Should Require the City to Include Mr. Gay in the Lottery, Rather Than Shutting Down the City's Entire Licensing Program. ...........................................31 |
| | F. | The PCN Process Should Not Be Subject to a TRO..............................32 |
| | G. | A Bond Sufficient to Compensate the Other SEIAs Must be Required........32 |
| V. | | CONCLUSION .........................................33 |

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AK Metals, LLC v. Norman Indus. Materials, Inc.*,
  No. 12cv2595-IEG (WVG), 2013 U.S. Dist. LEXIS 13793, 2013 WL 417323 (S.D.
  Cal. Jan. 31, 2013) ............................................................................................... 30

*American Trucking Associations, Inc. v. City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009) ........................................................................ 25, 26

*Ayotte v. Planned Parenthood of Northern New England*,
  546 U.S. 320 (2006) ................................................................................................ 31

*Bernstein v. Virgin Am., Inc.*,
  277 F. Supp. 3d 1049 (N.D. Cal. 2017) .................................................................. 21

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) .......................................................................................... 31, 32

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018) .................................................................................. 31

*Centocoor, Inc. v. MedImmune, Inc.*, No. C 02-03252,
  2002 U.S. Dist. LEXIS 21109 (N.D. Cal. Oct. 22, 2002) ....................................... 16

*Chapman v. Pier 1 Imps. (U.S.), Inc.*,
  631 F.3d 939 (9th Cir. 2011) .................................................................................. 31

*Cuviello v. City of Vallejo*,
  944 F.3d 816 (9th Cir. 2019) .................................................................................. 30

*Finch v. Treto*, No. 22 C 1508,
  2022 U.S. Dist. LEXIS 103222, at (N.D. Ill. June 9, 2022) .................... 19, 27, 29, 32

*Gen. Motors Corp. v. Tracy*,
  519 U.S. 278 (1997) .......................................................................................... 14, 30

OPPOSITION TO APPLICATION FOR TEMPORARY RESTRAINING ORDER

*Gonzales v. Raich*,
   545 U.S. 1 (2005) ............................................................... 14, 18, 30

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters*,
   415 U.S. 423 (1974) ............................................................ 13

*Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co.*,
   736 F.3d 255 (4th Cir. 2013) .............................................. 17

*Int'l Franchise Ass'n v. City of Seattle*,
   803 F.3d 389 (9th Cir. 2015) .............................................. 19, 21

*Kiva Health Brands LLC v. Kiva Brands Inc.*,
   402 F. Supp. 3d 877 (N.D. Cal. 2019) ................................ 17

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
   634 F.2d 1197 (9th Cir.1980) ............................................. 26

*Lewis v. Anderson*,
   615 F.2d 778 (9th Cir. 1979) .............................................. 27

*Lowe v. City of Detroit*,
   544 F. Supp. 3d 804 (E.D. Mich. 2021) ............................. 19

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ........................................................... 22

*Maine v. Taylor*,
   477 U.S. 131 (1986) ........................................................... 19

*Maya v. Centex Corp.*,
   658 F.3d 1060 (9th Cir. 2011) ............................................ 22

*Morgan Stanley & Co., LLC v. Couch*,
   134 F.Supp.3d 1215, (E.D. Cal. 2015) ............................... 26

*N.A. for the Advancement of Multijurisdiction Practice v. Berch*,
   773 F.3d 1037 (9th Cir. 2014) ............................................ 21

OPPOSITION TO APPLICATION FOR TEMPORARY RESTRAINING ORDER

*Nebraska v. Colorado*,
   577 U.S. 1211 (2016) .................................................................................. 18

*NPG, LLC v. City of Portland*, No. 2:20-cv-00208-NT,
   2020 U.S. Dist. LEXIS 146958 (D. Me. Aug. 14, 2020) ........................... 19

*Nuclear Info. & Res. Serv. v. Nuclear Reg. Comm'n*,
   457 F.3d 941 (9th Cir. 2006) ..................................................................... 22

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*,
   762 F.2d 1374 (9th Cir. 1985) ................................................................... 29

*Orion Wine Imps.. LLC v. Appelsmith*,
   837 F. App'x 585 (9th Cir. 2021) ............................................................... 23

*Pennzoil Co. v. Texaco, Inc.*,
   481 U.S. 1 (1987) ....................................................................................... 15

*Peridot Tree, Inc. v. City of Sacramento*, No. 2:22-cv-00289-KJM-DB,
   2022 U.S. Dist. LEXIS 190046 (E.D. Cal. Oct. 17, 2022) ............... 14, 24, 30

*Peta Inc. v. Beyond the Frame, Ltd.*, No. CV 10-07576 MMM (SSx),
   2011 U.S. Dist. LEXIS 157782 ................................................................. 16

*Pike v. Bruce Church*,
   397 U.S. 137 (1970) ................................................................................... 19

*Polk v. Gontmakher*, No. 2:18-cv-01434-RAJ,
   2019 U.S. Dist. LEXIS 146724 (W.D. Wash. Aug. 28, 2019) .................... 17

*Reno Air Racing Ass'n, Inc. v. McCord*,
   452 F.3d 1126 (9th Cir. 2006) ................................................................... 32

*Rocky Mt. Farmers Union v. Corey*,
   730 F.3d 1070 (9th Cir. 2013) ................................................................... 19

*Shulman v. Kaplan*, No. 2:19-CV-05413-AB (FFMx),
   2020 U.S. Dist. LEXIS 244161 (C.D. Cal. Oct. 29, 2020) ......................... 17

OPPOSITION TO APPLICATION FOR TEMPORARY RESTRAINING ORDER

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ................................................................................ 22

*Staffin v. Cty. of Shasta*, No. 2:13-cv-00315 JAM-CMK,
   2013 U.S. Dist. LEXIS 64625 (E.D. Cal. May 6, 2013) ........................... 17

*Toigo v. Dep't of Health & Senior Servs.*,
   549 F. Supp. 3d 985 (W.D. Mo. 2021) ...................................................... 19

*Tracy v. USAA Cas. Ins. Co.*, No. 11-00487 LEK-KSC,
   2012 U.S. Dist. LEXIS 35913 (D. Haw. Mar. 16, 2012) .......................... 17

*United States v. Oakland Cannabis Buyers' Co-Op*,
   532 U.S. 483 (2001) ........................................................................... 16, 31

*Vital Pharms., Inc. v. PhD Mktg., Inc.*,
   No. 220CV06745 RSWL (JCx), 2020 U.S. Dist. LEXIS 208394, 2020 WL 6545995
   (C.D. Cal. Nov. 6, 2020) .......................................................................... 30

*Walczak v. EPL Prolong, Inc.*,
   198 F.3d 725 (9th Cir. 1999) .................................................................... 33

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982) ................................................................................. 13

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .................................................................................... 13

**Statutes**

21 U.S.C. §§ 841, 812(c) ............................................................... 14, 18, 30
28 U.S.C. § 1983 ....................................................................................... 12
28 U.S.C. § 2201 ....................................................................................... 12
42 U.S.C. § 1983 ....................................................................................... 12
California Health and Safety Code § 11357.5 ............................................. 23
LAMC § 104.03(a)(4) ................................................................................ 12
LAMC § 104.06.1(c) ................................................................................. 11
LAMC § 104.06.1(c)(1) ............................................................................. 12
LAMC § 104.06.1(c)(3) ............................................................................. 12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAMC § 104.17 ............................................................................................ 32
LAMC § 104.20(a)(2)(i) ............................................................................... 21
LAMC § 104.20(b) (1)(ii)(3) ....................................................................... 10
LAMC § 104.20(b) (1)(ii)(4) ....................................................................... 11
LAMC § 104.20(b) (1)(ii)(5) ....................................................................... 11
LAMC § 104.20(b)(1)(i) ............................................................................... 10
LAMC § 104.20(b)(1)(ii)(1) .................................................................. 11, 20
LAMC § 104.20(b)(1)(ii)(3) ......................................................................... 20
LAMC § 104.20(b)(1)(ii)(4) .................................................................. 21, 24

**Rules**

Fed. R. Civ. P. 65(b)(1) ............................................................................... 32
Fed. R. Civ. P. 65(b)(1)(A) .......................................................................... 13
Fed. R. Civ. P. 65(c) .................................................................................... 33

## I.     INTRODUCTION

This case arises from the regulation of commercial cannabis licenses by the City of Los Angeles, which includes the Los Angeles Department of Cannabis Regulation and Michelle Garakian, in her official capacity (collectively, "City"). To rectify the effects of California's disastrous war on cannabis, the City currently limits its commercial cannabis licenses to individuals who have a California cannabis arrest or conviction and have either a low income or live in an area that has been disproportionately impacted by California's drug war. Plaintiffs Variscite, Inc. and Kenneth Gay ("Plaintiffs") claim the City's criteria violate the Dormant Commerce Clause because they purportedly favor in-state applicants, and move for a TRO to halt the City's imminent license lottery on that basis. The Court should deny the TRO application because it cannot satisfy any of the four criteria for a TRO.

**Likelihood of Success.** Plaintiffs are unlikely to succeed on the merits because the Ninth Circuit has not applied the Dormant Commerce Clause to cannabis regulations; because the City's criteria do not violate the Dormant Commerce Clause; and because Plaintiffs do not have standing to challenge the City's criteria in any event.

**Irreparable Harm.** Plaintiffs are unlikely to suffer irreparable harm because they are pursuing a commercial cannabis license for the purpose of earning a profit, which can be addressed through monetary damages.

**Balance of Equities.** A TRO should not issue because there are 508 other license applicants who would be irreparably harmed by a TRO. Additionally, equitable relief may not issue where, as here, Plaintiffs inexplicably delayed their filing by months or years.

**Public Interest.** A TRO is not in the public interest because the purpose of the Dormant Commerce Clause – to preserve competitive national markets – does not apply to federally illegal cannabis markets. Plaintiffs are asking for a TRO to allow them to conduct a business that the federal government does not condone.

For these reasons, as elaborated below, the Court must deny the TRO application.

## II.   FACTUAL SUMMARY

### A.   The City's Social Equity Program.

In 2017, the City enacted its first commercial cannabis laws in anticipation of the decriminalization of certain retail cannabis activities. The City's licensing scheme includes a Social Equity Program intended to promote equitable ownership and employment opportunities in the cannabis industry in order to decrease disparities in life outcomes for marginalized communities, and to address the disproportionate impacts of prior cannabis criminalization. (Declaration of Jason Killeen ["Killeen Decl."] ¶ 5.) The storefront retail, delivery, and cultivation application processes are exclusively available to verified Social Equity Individual Applicants ("SEIAs") until January 1, 2025. (*Id.*) After January 1, 2025, all commercial cannabis application types will be available to all applicants, regardless of whether they meet the SEIA requirements. (*Id.*)

### B.   The SEIA Verification Process.

To participate in the Social Equity Program, an individual must request verification as a SEIA. To be verified as a SEIA, an individual must submit evidence of two of the following three criteria ("Verification Criteria"): (a) a qualifying California Cannabis Arrest or Conviction prior to November 8, 2016; and (b)(1) 10 years of residency in a Disproportionately Impacted Area; or (b)(2) low income in the 2020 or 2021 calendar year. (Los Angeles Municipal Code ("LAMC") § 104.20(b)(1)(i)[1].) None of these criteria require an applicant to be a California resident.

A "California Cannabis Arrest or Conviction" means "an arrest or conviction in California for any crime under the laws of the State of California or the United States relating to the sale, possession, use, manufacture, or cultivation of Cannabis that occurred prior to November 8, 2016." (LAMC § 104.20(b)(1)(ii)(3).) This criterion may be evidenced by arrest records, court records, or other official government documents

---

[1] Section 104 of the LAMC is attached to the City's Request for Judicial Notice as Exhibit A.  All references herein to the LAMC are included in that exhibit.

which identify the relevant statute or crime. (Killeen Decl. ¶ 6(a).)

"Disproportionately Impacted Area" ("DIA") means "Police Reporting Districts as established in the Expanded Social Equity Analysis, or as established using the same methodology and criteria in a similar analysis provided by an Applicant for an area outside of the City." (LAMC § 104.20(b)(1)(ii)(4).) The Expanded Social Equity Analysis is a report commissioned by the Los Angeles City Council to identify areas within the City that have greater than the mean number of cannabis-related arrests for the City and composed of 60 percent or more low-income households. (TRO App. p. 9; *see also* Exh. 1 to Decl. of Christian Kernkamp.) Residence in a DIA can be shown with at least one document per year of residency, including but not limited to, school transcripts, leases, utility bills, phone bills, government issued identification cards, dated bank statements, tax returns, financial statements, voter registration, government or court documents, vehicle registration, home-related paperwork, insurance documents, and pay stubs. (Killeen Decl. ¶ 6(b).)

"Low Income" means both of the following "(1) the Social Equity Individual Applicant meets the low-income thresholds established in the annual U.S. Department of Housing and Urban Development (HUD) income limits based upon the Area Median Income (AMI) for Los Angeles County based on household size; and (2) the Social Equity Individual Applicant does not have Assets in excess of the amount as defined in this subsection." (LAMC § 104.20(b)(1)(ii)(5).) This criterion may be evidenced by (i) a complete tax return, including all schedules, for calendar year 2020 or 2021; and (ii) the City's Asset Attestation Form showing net assets at or below four times the relevant thresholds, based on household size. (LAMC § 104.20(b)(1)(ii)(1); Killeen Decl. ¶ 6(c).)

## C.    The Phase 3 Retail Round 2 ("P3RR2") Lottery.

The City's next planned application phase is for storefront retail applications. (Killeen Decl. ¶ 7.) In this next phase, the City will identify SEIAs who are eligible to submit retail storefront applications through a random selection process, called the P3RR2 Lottery. (*Id.*; LAMC § 104.06.1(c).) The City plans to conduct the P3RR2

Lottery on December 8, 2022. (Killeen Decl. ¶ 9.) To participate in the P3RR2 Lottery, individuals must be verified as a SEIA with a California Cannabis Arrest or Conviction, and either one of the remaining two criteria. (LAMC § 104.06.1(c)(3); Killeen Decl. ¶ 10.) In anticipation of the P3RR2 Lottery, the City accepted verification submissions between May 26, 2022 and July 25, 2022. (Killeen Decl. ¶ 11.) The City received approximately 1,139 unique eligibility verification requests, 516 of which were verified. (Killeen Decl. ¶ 12.) 508 of those registered to participate in the lottery. (*Id.* ¶ 21.)

### D.   PCN Process.

In addition to the lottery process, storefront retail license opportunities are available through the City's Public Convenience and Necessity ("PCN") process. (Killeen Decl. ¶ 23.) PCN applications are available in Community Plan Areas of the City which have reached or surpassed the permissible number of retail storefront licenses based on population size. (*Id.*; LAMC § 104.03(a)(4).) A PCN application requires approval of the Los Angeles City Council before an application may be processed. (Killeen Decl. ¶ 23; LAMC § 104.03(a)(4).) PCN applicants must be verified SEIAs. (Killeen Decl. ¶ 23.)  Unlike the P3RR2 Lottery, SEIAs applying for the PCN process do not need a California Cannabis Arrest or Conviction. (Killeen Decl. ¶ 23.)

### E.   Kenneth Gay's SEIA Application and Complaint.

On July 12, 2022, Mr. Gay applied to be verified as a SEIA for the P3RR2 Lottery. (Killeen Decl. ¶ 15.) Based on the records submitted, Mr. Gay did not satisfy any of the Verification Criteria. (*Id.*) He thereafter filed the instant case.

The complaint argues that the City's California Cannabis Arrest or Conviction and DIA requirements violate the Dormant Commerce Clause. On that basis, Plaintiffs assert four claims: (1) per 42 U.S.C. § 1983, for violation of the Dormant Commerce Clause, against the City's Lottery scheme; (2) per 28 U.S.C. § 2201, for declaratory relief, against the City's Lottery scheme; (3) per 28 U.S.C. § 1983 for violation of the Dormant Commerce Clause, as against the City's PCN process; and (4) for declaratory relief, against the City's PCN process. (Comp. ¶¶ 35-50.)

## III.   LEGAL STANDARD

An injunction is an equitable remedy. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). A temporary restraining order may be issued upon a showing "that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). The purpose of such an order is to preserve the status quo and to prevent irreparable harm "just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 439 (1974).

When courts determine whether to issue a temporary restraining order or a preliminary injunction, they address the following criteria: whether the moving party "is likely to succeed on the merits," is "likely to suffer irreparable harm in the absence of preliminary relief," whether "the balance of equities tips in [its] favor," and whether "an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## IV.   ARGUMENT

The Court should deny the TRO Application because Plaintiffs cannot meet any of the criteria for a TRO. Specifically, as set forth below, Plaintiffs are unlikely to succeed on the merits, they are unlikely to suffer irreparable harm, the balance of equities does not tip in their favor, and a TRO is not in the public interest.

### A.   Plaintiffs Are Unlikely to Succeed on the Merits.

Plaintiffs are unlikely to succeed on the merits, for four reasons.

First, the Ninth Circuit has not applied the Dormant Commerce Clause to local cannabis regulations. Second, requiring the City to accept out-of-state convictions would incentivize criminal conduct in other states and violate the Controlled Substances Act. Third, none of the City's criteria exclude out-of-state applicants or otherwise burden interstate commerce, and would not violate the Dormant Commerce Clause if it applied. Fourth, Plaintiffs do not have standing to challenge the Social Equity Program because they cannot satisfy the unchallenged criteria to be verified as a SEIA.

1.      **The Ninth Circuit Has Not Applied the Dormant Commerce Clause to Cannabis Regulations.**

Plaintiffs are unlikely to succeed on the merits because the Dormant Commerce Clause does not, as a matter of law, apply to local cannabis regulations. The purpose of the Dormant Commerce Clause is to preserve competitive interstate markets, but Congress has outlawed the interstate market for cannabis. *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997) (regarding the purpose of the Dormant Commerce Clause); 21 U.S.C. §§ 841, 812(c)(Schedule 1)(c)(10); *Gonzales v. Raich*, 545 U.S. 1, 22 (2005). There is accordingly no legal basis to apply the Dormant Commerce Clause here.

The City's research revealed no cases in which the Ninth Circuit Court of Appeals or any district courts within the Ninth Circuit had applied the Dormant Commerce Clause to local cannabis regulations. To the contrary, district courts within the Ninth Circuit, including the federal district court for the Central District of California, have expressly declined to apply federal law or equitable principles to the benefit of cannabis sellers like Plaintiffs. Under current Ninth Circuit precedent, Plaintiffs' challenge must therefore fail insofar as it relies on the Dormant Commerce Clause.

The case most directly on point is *Peridot Tree, Inc. v. City of Sacramento*, No. 2:22-cv-00289-KJM-DB, 2022 U.S. Dist. LEXIS 190046, at *2 (E.D. Cal. Oct. 17, 2022).  Mr. Gay is a plaintiff in that case, and counsel for Plaintiffs here is also counsel for the plaintiffs in *Peridot Tree*. *Id.* at *1. In that case, the district court for the Eastern District of California abstained from the same question posed by this case, namely whether the Dormant Commerce Clause applies to local cannabis regulations. *Id.* at *31. This Court should follow the approach taken by *Peridot Tree*.

In *Peridot Tree*, Mr. Gay challenged the "CORE" program promulgated by the City of Sacramento to "address the negative impact of disproportionate enforcement of cannabis-related regulation" and reduce "barriers of entry and participation" in the cannabis industry to those who "have been negatively impacted by the disproportionate law enforcement of cannabis related crimes." *Id.* at *2. Because the CORE program

14

included a Sacramento residency requirement, Mr. Gay contended that it violated the Dormant Commerce Clause. *Id.* at \*4. Sacramento moved to dismiss, and the court asked the parties to brief whether it should abstain from exercising jurisdiction at all. *Id.*

In a remarkably well-researched opinion, the court in *Peridot Tree* decided to abstain from the matter entirely to allow the plaintiffs to pursue their relief in state court. *Id.* at \*31. Although it recognized that "this case does not fit neatly within any single abstention doctrine," the court noted that those doctrines "are not 'rigid pigeonholes into which federal courts must try to fit cases.'" *Id.* at \*9, citing *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 12, n.9 (1987). Based on an extensive review of the law and the "murky" history of federal cannabis enforcement, the court presented three reasons for abstention, all of which apply here. *Id.* at \*23.

**Conflict of State/Federal Interests.** The first reason for abstention was that all abstention doctrines rest on a concern about the conflicts between federal and state policies, and that the question posed by Mr. Gay involved a serious conflict between those policies. *Id.* at \*12. Specifically, the court observed that the state and local governments in California were trailblazing a path forward on cannabis legalization while the federal government sent "mixed messages" on enforcement, maintaining prohibition on one hand while discouraging federal prosecutors from pursuing cannabis cases on the other. *Id.* at \*16. Accordingly, "the ambiguity of federal policy" was "one reason to doubt the salience of the federal interests at stake in this case." *Id.* at \*21.

**Illegality of Interstate Markets.** The second reason for abstention was that the purposes of the Dormant Commerce Clause – to preserve national markets for goods and services – did not apply to a market that the federal government had deemed to be illegal. *Id.* at \*21. The court found it "difficult to see what constitutional right a person could have to participate freely in illegal interstate marijuana markets." *Id.* Thus, the district court found that "the nature of Peridot and Gay's claim . . . rests on shaky constitutional grounds," especially compared to California's "clear and substantial

interests" in socially equitable regulation of the cannabis market. *Id.* This, too, constituted a "circumstance[] [that] makes a strong case for abstention." *Id.* at *24.

**<u>Unclean Hands.</u>** The third reason for abstention was that Mr. Gay could not credibly request a federal court to exercise its legal or equitable powers to allow him to commit a federal crime. *Id.* In doing so, the court relied on a series of cases in which federal courts refused to award damages or equitable relief to sellers of cannabis, some of which applied the "unclean hands" defense to equitable relief. *Id.* at *25. Although the court noted that the "unclean hands" defense "has its faults" when raised by a local government that itself authorizes cannabis sales, it found that the Supreme Court had already rendered a determination on its applicability and held that "federal district courts cannot employ their equitable powers if doing so would effectively revisit decisions Congress had already made when it passed the Controlled Substances Act." *Id.* at *26, citing *United States v. Oakland Cannabis Buyers' Co-Op*, 532 U.S. 483, 497-98 (2001).

*Peridot Tree* is applicable here, and it supports denying Plaintiffs' requested TRO and abstaining from this matter entirely. It is doubly applicable because that case and the instant case are brought by the same underlying Plaintiff: Kenneth Gay. Principles of comity, including the first-to-file rule, require this court to abide by the *Peridot Tree* court's order of abstention to avoid conflicting judgments. *See Peta Inc. v. Beyond the Frame, Ltd.*, No. CV 10-07576 MMM (SSx), 2011 U.S. Dist. LEXIS 157782, at *2 (C.D. Cal. Feb. 16, 2011) ("The first-to-file rule is a principle of federal comity that permits a district court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district."); *Centocoor, Inc. v. MedImmune, Inc.*, No. C 02-03252, 2002 U.S. Dist. LEXIS 21109, at *3 (N.D. Cal. Oct. 22, 2002) (stating that the first-to-file rule does not require identical issues or parties if the actions involve closely related questions or common subject matter). The City will move for an order of abstention with its response to the Complaint, but the Court may raise the issue *sua sponte. Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co.*, 736 F.3d 255, 258 (4th Cir. 2013).

*Peridot Tree* is only the most recent example of federal courts routinely and consistently declining to apply federal law or equitable principles to the benefit of cannabis growers and/or sellers. *See, e.g.*, *Shulman v. Kaplan*, No. 2:19-CV-05413-AB (FFMx), 2020 U.S. Dist. LEXIS 244161, at *5 (C.D. Cal. Oct. 29, 2020) (refusing to grant any relief to a cannabis seller on RICO and Lanham Act claims on the grounds that "[a] court order requiring monetary payment to Plaintiffs for the loss of profits or injury to a business that produces and markets cannabis would, in essence, (1) provide a remedy for actions that are unequivocally illegal under federal law, and (2) necessitate that a federal court contravene a federal statute (the CSA) in order to provide relief under a federal statute (RICO) . . . [t]he Court finds this contrary to public policy."); *Kiva Health Brands LLC v. Kiva Brands Inc.*, 402 F. Supp. 3d 877, 888 (N.D. Cal. 2019) (refusing to recognize a "first use" trademark defense asserted by a cannabis retailer on the grounds that recognizing that defense "would put the government in the anomalous position of extending the benefits of trademark protection to a seller based upon actions the seller took in violation of that government's own laws."); *Polk v. Gontmakher*, No. 2:18-cv-01434-RAJ, 2019 U.S. Dist. LEXIS 146724, at *5 (W.D. Wash. Aug. 28, 2019) (refusing to enforce a partnership agreement among cannabis growers and sellers on the grounds that "[c]ontracts that violate a federal statute are illegal and unenforceable."); *Staffin v. Cty. of Shasta*, No. 2:13-cv-00315 JAM-CMK, 2013 U.S. Dist. LEXIS 64625, at *11 (E.D. Cal. May 6, 2013) (dismissing civil rights claims brought by a cannabis retailer/distributor against the local sheriff on the grounds that the cannabis business was outlawed federally); *Tracy v. USAA Cas. Ins. Co.*, No. 11-00487 LEK-KSC, 2012 U.S. Dist. LEXIS 35913, at *39 (D. Haw. Mar. 16, 2012) (refusing to enforce an insurance claim for the replacement of cannabis plants).

There is simply no controlling authority that suggests that the Dormant Commerce Clause applies to local cannabis regulations in the Ninth Circuit. All of the comparable authorities from courts in the Ninth Circuit indicate the opposite: that the federal government has no interest in enforcing federal rights on behalf of cannabis sellers.

**2.    Requiring the City to Accept Out-of-State Convictions Would Incentivize Criminal Conduct in Other States and Violate the Controlled Substances Act.**

Plaintiffs are also unlikely to succeed on the merits because requiring the City to endorse cannabis arrests and convictions from outside California would facilitate an illegal interstate cannabis market in violation of the Controlled Substances Act. 21 U.S.C. §§ 841, 812(c)(Schedule 1)(c)(10); *Raich*, 545 U.S. at 22. It would also potentially require the City to aid and abet in the violation of the laws of other states where cannabis is currently prohibited. Thus, an individual might face prosecution in Oklahoma for recreational cannabis possession, while being rewarded for that crime in California. This is a legally untenable outcome.

The City's Social Equity Program must only address California's 2016 reversal of cannabis prohibition. Other state governments, like Oklahoma, have the right to prohibit cannabis within their borders.  If this Court forces the City to accept out-of-state arrests and convictions in verifying SEIAs, it would incentivize illegal actions in states, territories, and commonwealths where cannabis is prohibited, which in at least one instance has already led to litigation among the states. *See Nebraska v. Colorado*, 577 U.S. 1211, 1214 (2016) (in which Nebraska and Oklahoma claimed that Colorado's regulatory scheme "increased trafficking and transportation of Colorado-sourced marijuana" into their territories, requiring them to expend significant "law enforcement, judicial system, and penal system resources" to combat the increased trafficking and transportation of marijuana). The City's Social Equity Program carefully avoids invasive and anti-federalist policy by limiting its scope to only counteract California's pre-2016 recreational cannabis prohibition and allowing anyone who was detrimentally impacted by California's former laws, including non-California residents, to be registered as SEIAs. This Court cannot subvert the City's Social Equity Program in the manner requested by Plaintiffs without violating the Controlled Substances Act and potentially undermining other states' prohibitions on cannabis.

3. **The City's Social Equity Program Does Not Exclude Out-of-State Applicants or Otherwise Burden Interstate Commerce.**

Even if the Dormant Commerce Clause were applied here, the City's Social Equity Program would not violate it. The Dormant Commerce Clause guards against economic protectionism or discrimination against out-of-state economic interests. *Rocky Mt. Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013). According to the Ninth Circuit:

> If a statute discriminates against out-of-state entities on its face, in its purpose, or in its practical effect, it is unconstitutional unless it "serves a legitimate local purpose, and this purpose could not be served as well by available nondiscriminatory means." Absent discrimination, we will uphold the law "unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits."

*Id.* at 1087-88 (citing *Maine v. Taylor*, 477 U.S. 131, 138 (1986), and *Pike v. Bruce Church*, 397 U.S. 137, 142 (1970)); *accord Int'l Franchise Ass'n v. City of Seattle*, 803 F.3d 389, 399-400 (9th Cir. 2015).

The SEIA requirements do not discriminate against out-of-state residents. None of the requirements are expressly limited to California residents. To the contrary, each of the requirements were formulated in an open-ended fashion such that persons living outside of California may be verified as SEIAs. The City's requirements are therefore unlike the requirements that were found to violate the Dormant Commerce Clause in the recent cannabis cases cited by Plaintiffs. *See Finch v. Treto*, No. 22 C 1508, 2022 U.S. Dist. LEXIS 103222, at *6 (N.D. Ill. June 9, 2022); *Lowe v. City of Detroit*, 544 F. Supp. 3d 804, 808 (E.D. Mich. 2021); *Toigo v. Dep't of Health & Senior Servs.*, 549 F. Supp. 3d 985, 991 (W.D. Mo. 2021); *NPG, LLC v. City of Portland*, No. 2:20-cv-00208-NT, 2020 U.S. Dist. LEXIS 146958, at *3 (D. Me. Aug. 14, 2020).

**California Cannabis Arrest or Conviction.** The Social Equity Program requires that an SEIA have a qualifying "California Cannabis Arrest or Conviction" that is "an arrest or conviction in California for any crime under the laws of the State of California or the United States relating to the sale, possession, use, manufacture, or cultivation of

Cannabis that occurred prior to November 8, 2016." (LAMC 104.20(b)(1)(ii)(3).) This requirement is plainly not limited to California residents. Indeed, an out-of-state resident may have incurred a California arrest or conviction while visiting or traveling through the state. Alternatively, a former California resident may have incurred a California arrest or conviction before moving out of the state.

**Low-Income.** The Social Equity Program requires that an SEIA be "Low-Income," meaning that they meet the "low-income thresholds established in the annual U.S. Department of Housing and Urban Development (HUD) income limits based upon the Area Median Income (AMI) for Los Angeles County based on household size; and . . . [do] not have Assets in excess of [four times the Low-Income thresholds based on Household Size]." (LAMC 104.20(b)(1)(ii)(1) [defining "Asset"], 104.20(b)(1)(ii)(5) [defining Low-Income].) The Code contains no residency requirement at all. In fact, by tying the definition of Low-Income to the area median income of Los Angeles County, the requirement is actually more forgiving and more inclusive to out-of-state residents who, on average, have a lower annual salaries and a lower cost of living than Los Angeles residents. For example, the 2021 Low-Income HUD limit for a household of one person living in Los Angeles County, California, is $66,250 (RJN, Exh. B.), whereas the 2021 Low-Income HUD limit for a household of one person in Calhoun County, Michigan,[2] is $36,150 (*see* RJN, Exh. C)—almost half as much.

**Disproportionately Impacted Area.** The Social Equity Program requires that an SEIA have ten years of residency in a DIA, which are "Police Reporting Districts as established in the Expanded Social Equity Analysis, or as established using the same methodology and criteria in a similar analysis provided by an Applicant for an area outside of the City." (LAMC 104.20(b)(1)(ii)(4).) Once again, the Code contains no residency requirement. Rather, the Code expressly contemplates DIAs "outside of the

---

[2] The records that Plaintiff Gay submitted to DCR in conjunction with his SEIA verification request show that he lives in Calhoun County, Michigan. (*See* Gay Decl., Exh. 6.)

City," which include DIAs that are out of state. *See*, *e.g.*, *Int'l Franchise Ass'n*, 803 F.3d at 400 (concluding a plaintiff failed to show that a local minimum wage ordinance facially discriminated against out-of-state entities or interstate commerce where the ordinance did not classify employers based on their location, the location of their employees, or the extent to which they participated in interstate commerce); *N.A. for the Advancement of Multijurisdiction Practice v. Berch*, 773 F.3d 1037, 1049 (9th Cir. 2014) (concluding a state law did not discriminate against out-of-state interests because "it requires the same of its citizens as it does citizens of other states"). The Code also does not limit a person to using a single DIA, or even their current place of residence to meet this requirement.

Similarly, the SEIA requirements do not "substantially burden" interstate commerce for several reasons. *Bernstein v. Virgin Am., Inc.*, 277 F. Supp. 3d 1049, 1065 (N.D. Cal. 2017) (stating that a non-discriminatory law will only be struck down under the Dormant Commerce Clause if it places a "substantial burden" on interstate commerce, as opposed to a mere "incidental" one). First, none of the SEIA requirements actually require a person to have ever lived in California, either currently or formerly. Second, the Code is flexible; it provides two alternative ways in which a person may be verified as an SEIA for the Lottery, *i.e.*, by having a California Cannabis Arrest or Conviction and being Low-Income, or, by having a California Cannabis Arrest or Conviction and have lived in a DIA for ten years. Third, it is important to note that the SEIA requirements only apply to SEIAs, and not all Owners of an Applicant or Licensee. (LAMC 104.20(a)(2)(i).) Indeed, the Social Equity Program only requires that an SEIA own a certain minimum percentage—not the entirety—of an Applicant or Licensee and, in this way, the Code specifically contemplates and accounts for the participation of out-of-state residents. Thus, Plaintiffs are not prohibited from participating in the Social Equity Program; they can partner with an SEIA to participate in the P3RR2 Lottery and/or submit a PCN Application.

**4.      Plaintiffs Do Not Have Standing to Challenge the City's Social Equity Program.**

The Court must also deny Plaintiffs' application for a TRO because Plaintiffs do not have standing to challenge the City's Social Equity Program. Standing is a fundamental prerequisite to obtaining any relief, equitable or otherwise, in federal courts. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum" for Article III standing requires any plaintiff to demonstrate he or she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Here, Mr. Gay would not be verified as a SEIA even if the purportedly unconstitutional aspects of the Verification Criteria were excised. Specifically, Mr. Gay: (1) failed to submit documentation showing a qualifying cannabis conviction (regardless of which state the conviction occurred in); (2) failed to submit documentation showing ten years' residence in a DIA (even if his area of residence were deemed a DIA); and (3) failed to submit evidence that he is "low-income" under federal HUD standards.

Thus, the "traceability" criterion of Article III standing cannot be met because the unchallenged provisions of the Social Equity Program would inflict the same "injury" on Mr. Gay by barring his verification. *See Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (requiring a "line of causation" between the defendant's action and the alleged harm). Likewise, because Mr. Gay's verification would be denied even if the Court were to strike down the purportedly unconstitutional criteria, a favorable ruling would not remedy Plaintiffs' alleged injury, which means the redressability criterion of Article III standing cannot be met as well. *See Nuclear Info. & Res. Serv. v. Nuclear Reg. Comm'n*, 457 F.3d 941, 955 (9th Cir. 2006); *Orion Wine Imps.. LLC v. Appelsmith*, 837 F. App'x 585, 586 (9th Cir. 2021) (affirming dismissal of complaint where unchallenged provisions of California's Alcoholic Beverage Control Act would prohibit the plaintiff's proposed transaction).

a.     Mr. Gay Failed to Submit Sufficient Documentation of Any Qualifying Conviction, Regardless of Where it Occurred.

As to his conviction, Mr. Gay submitted two documents to support this criterion: an "ICHAT" Michigan Criminal History Record Information Criteria and a Motion and Order for Discharge from Probation. (Killen Decl. ¶¶ 16(a)(i), (ii); Gay Decl., Exh. 2.) The ICHAT document, however, does not appear to be an official government record. (*See* Gay Decl., Exh. 2.) Page 1 includes several express disclaimers discouraging reliance on the document. (*Id.*) The document also appears to be modified. (*Id.*) Specifically, Mr. Gay appears to have inserted an unnumbered page between the pages numbered two and three. (*Id.*) The unnumbered page is the only page listing Mr. Gay's purported cannabis arrest or conviction. (*Id.*) The documentation submitted to evidence Mr. Gay's conviction is therefore insufficient because it is not an official government record, unclear, incomplete, or modified from the official government record.

The Motion and Order for Discharge from Probation is similarly deficient. Based on this document, Mr. Gay was convicted under Michigan's Public Health Code section 333.7401. (Killeen Decl. ¶ 16(a)(ii); Gay Decl., Exh. 1.) This code section relates to both marijuana and synthetic equivalents. The Centers for Disease Control and Prevention (CDC) reports that there are hundreds of different chemicals sold as synthetic marijuana. Pursuant to California Health and Safety Code section 11357.5, synthetic marijuana is illegal in California and is not considered cannabis. Therefore, it is unclear whether Mr. Gay's arrest or conviction is, in fact, cannabis-related.

b.     Mr. Gay Failed to Fully Disclose His Assets and Income, Disqualifying Him as a Low-Income Applicant.

As to Mr. Gay's income, the City could not verify him as a low-income applicant because he failed to fully disclose his assets and income, and because his documentation is otherwise incomplete. (Killeen Decl. ¶ 16(b).) Mr. Gay's income documentation is incomplete because Mr. Gay did not disclose at least three material facts on his Asset Attestation Form.  (*Id.* ¶ 16(b)(i), Exh. A.) The Asset Attestation Form states that the

"submission of false or misleading information or the failure to disclose material facts may result in the denial of [a] Social Equity Individual Applicant eligibility verification request, or the subsequent denial of an application." (*Id.*) Schedule C of Mr. Gay's tax return, however, reveals that there are assets associated with his construction company, including vehicles, equipment, and/or tools, that are not disclosed on his Asset Attestation Form.  (Killeen Decl. ¶ 16(b)(ii), Gay Decl, Exh. 3.) Moreover, Mr. Gay admits that he owns a 51% equity stake (51,000 shares) in Variscite, Inc. that was also not disclosed. (Gay Decl. ¶ 4.) Finally, Mr. Gay's litigation in other jurisdictions demonstrates he has business interests in entities other than Variscite, Inc., including Peridot Tree, Inc. and Variscite NY One, Inc., neither of which were disclosed. *See, e.g., Peridot Tree,* 2022 U.S. Dist. LEXIS 190046, at *2; *Variscite NY One, Inc. v. State of New York et al.*, No. 1:2022-cv-01013 (N.D.N.Y Nov. 10, 2022).

            c.      <u>Mr. Gay Failed to Submit Sufficient Documentation of 10 Years' Residence Anywhere, Regardless of Whether that Residence was in a DIA.</u>

As to the DIA residency requirement, Mr. Gay did not submit sufficient documentation for two reasons:  First, Mr. Gay did not submit an analysis using the same methodology and criteria for an area outside of the City, as required under LAMC section 104.20(b)(1)(ii)(4). (Killeen Decl. ¶ 16(c)(i), Kernkamp Decl., Exh. 3.) Although Mr. Gay submitted a document pertinent to this subject, it does not show the criteria used to determine eligible locations or the underlying methodology. (*Id.*) The City would have accepted an analysis that demonstrated Battle Creek, Michigan qualifies as a Disproportionately Impacted Area using the same methodology and criteria as used to determine Disproportionately Impacted Areas in the City. (Killeen Decl. ¶ 16(c)(i).)

Second, and more importantly, Mr. Gay also did not submit enough records to evidence 10 years of cumulative residency in any location. (Killeen Decl. ¶ 16(c)(ii).) Specifically, he submitted five records that evidence only five years of residency. (*Id.*) Mr. Gay also submitted an undated letter from Gail A. Hardy purportedly evidencing

Mr. Gay's residency. (*Id.*; *see also* Gay Decl., Exh. 5.) The City has never accepted declarations or attestations as proof of residency; thus, Gail A. Hardy's undated letter is not sufficient evidence of Mr. Gay's residency. (Killeen Decl. ¶ 16(c)(ii).) Therefore, even if Battle Creek, Michigan was a Disproportionately Impacted Area, the City would not have verified Mr. Gay under this criterion because he did not submit evidence of 10 years of cumulative residency in that city. (*Id.*)

Thus, Plaintiffs' injury is not directly traceable to any purportedly unconstitutional criteria, and even if it were, an order excising the purportedly unconstitutional aspects of those criteria would not redress Plaintiffs' injury.

**B.    Plaintiffs Are Unlikely to Suffer Irreparable Harm.**

Although the Ninth Circuit has held that an alleged violation of the Commerce Clause is sufficient to satisfy the irreparable harm prong of the preliminary injunction analysis, the present case does not present the same circumstances. In *American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009), the case cited by Plaintiffs, a trucking association brought an action against cities alleging that mandatory concession agreements for drayage trucking services at ports were preempted by the Federal Aviation Administration Authorization Act and violated the Commerce Clause. The Ninth Circuit noted the plaintiffs in *American Trucking Associations, Inc.* were given an untenable choice: either sign a likely unconstitutional agreement and incur costs that could sink their existing business, or refuse to sign the agreement and lose all of their existing business. *Id.* at 1058. In their review, the Ninth Circuit focused on the impact of the alleged violation of the Commerce Clause on the plaintiff's existing business. *Id.*

Citing to *American Trucking Associations, Inc*, Plaintiffs wrongly assume that the mere allegation of a violation of the Dormant Commerce Clause is sufficient to satisfy the irreparable harm prong of preliminary injunction analysis here. This is not so. Unlike in *American Trucking Associations, Inc*, Plaintiffs' current claims are based on speculative business conduct as opposed to the loss of an existing business. Furthermore,

Plaintiffs cannot allege the City's requirement that a SEIA have a California arrest or conviction to enter the P3RR2 lottery is fatal to their existing business and/or revenue because entrance into the P3RR2 lottery itself does not guarantee a license will issue or create revenue. Therefore, unlike *American Trucking Associations, Inc.,* the Plaintiffs' monetary losses associated with the alleged violation are purely speculative, will not cause immediate damages, and—as discussed below—can be redressed through monetary damages. As a result, the mere allegation of a violation the Dormant Commerce Clause and speculative monetary damages is insufficient to demonstrate irreparable harm.

Moreover, contrary to Plaintiffs' assertions, since Plaintiffs' loss of business claim amounts to nothing more than a claim that can be compensated by way of monetary damages, their claim of irreparable harm is unfounded. *See Morgan Stanley & Co., LLC v. Couch*, 134 F.Supp.3d 1215, 1234, (E.D. Cal. 2015) aff'd 659 Fed. Appx. 402 (9th Cir. 2016). Typically, monetary harm does not constitute irreparable harm for purposes of injunctive relief; economic damages are not traditionally considered to be irreparable because the injury can later be remedied by a damage award. Based on the foregoing, Plaintiffs' assertion of a general "threat" to its loss of business is insufficient. *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir.1980)

In addition, Plaintiffs are not irreparably harmed because, as they admit, additional retail licenses that are not tied to the SEIA program will be available for adult use licenses in the future. (TRO App. p. 18; *see also* Killeen Decl. ¶ 5.)

## C. The Balance of Equities Tips Heavily Against a TRO.

The balance of the equities tips sharply against the issuance of a TRO, for two reasons.  First, halting the P3RR2 lottery would harm the other 508 license applicants, many of whom have invested significant resources into getting their cannabis businesses running as soon as possible. Second, Plaintiffs have known of the Verification Criteria for months or potentially years, and yet waited until the last possible minute before the

1   P3RR2 lottery to file suit and request this TRO. Their inexplicable delay militates
2   heavily against the issuance of a TRO.

3                 **1.**      **Halting the P3RR2 Lottery Would Harm the Other 508 License**
4                           **Applicants.**

5         Injunctive relief may be denied where it would adversely affect the rights of
6   persons who are not parties to the litigation. *See, e.g.*, *Lewis v. Anderson*, 615 F.2d 778,
7   783 (9th Cir. 1979); see also *Finch v. Treto*, 2022 U.S. Dist. LEXIS 103222, at *51-52
8   (denying a "sweeping, highly disruptive" preliminary injunction against a cannabis
9   lottery where "such an order would undoubtedly harm many third parties").

10        Here, a TRO would adversely affect – and irreparably harm – the rights of the 508
11  SEIAs who are eligible and registered to participate in the P3RR2 Lottery.

12        In California, commercial cannabis applicants must obtain a license from their
13  local jurisdiction and from the State of California Department of Cannabis Control
14  ("DCC") prior to beginning operations. (Killeen Decl. ¶ 27.) Currently, DCC offers a
15  provisional license to applicants, which enables them to begin commercial cannabis
16  operations while they pursue an annual license with the City. (*Id.* ¶ 28.) If an applicant
17  cannot obtain a provisional license from DCC, they must delay the beginning of their
18  business operations until they obtain an annual license from both the City and DCC.
19  (*Id.*) Significantly, the last day for any person, including SEIAs, to apply for a
20  provisional license from DCC is March 31, 2023. (*Id.* ¶¶ 28, 31.)

21        The cut-off date to obtain a DCC provisional license is important to viability of
22  SEIA-run businesses for several reasons. For example, without a provisional license,
23  SEIAs will likely be forced to pay additional rent or mortgage to maintain a property
24  where they cannot yet conduct a cannabis business until they complete the annual
25  licensing process with the City and DCC. Indeed, in order to obtain an annual license
26  from the City and DCC, an applicant must submit a complete application, which
27  includes proof of an executed lease or property deed. (*Id.* ¶ 30.) Compounding matters,
28  the DCC annual licensing process is also significantly longer and more expensive. (*Id.*)

Under current state law, that process will take at least 12 to 18 months to complete. (*Id.*) The difference in holding costs between the provisional license and annual license processes exceed $100,000 per business. (*Id.*) In contrast, SEIAs can complete the City's temporary license process and DCC provisional license process in less than three months. (*Id.*) Thus, any postponement of the City's verification process and/or P3RR2 Lottery will jeopardize the ability for SEIAs selected in the P3RR2 Lottery to apply for a DCC provisional license by March 31, 2023. (*Id.* ¶ 33.)

In addition, eligible SEIAs will also risk whatever investments they have made in their incipient businesses to date.  For example, one verified SEIA, Jesse Frierson, entered into an agreement to hold the property at 7542-44 Balboa Boulevard in Van Nuys, in order to comply with the regulatory requirements for the City's cannabis licensing scheme. (Declaration of Jesse Frierson ["Frierson Decl."] ¶ 4.) As part of that agreement, he was obligated to put up ten thousand dollars ($10,000.00) of his own funds to reserve the property. (*Id.* ¶ 5.) He had anticipated making a profit from his investment after the Lottery is held, if he receives a storefront retail license. (*Id.* ¶ 5.) However, if the Lottery does not proceed in December 2022, he will lose that investment with no immediate means of recouping it. (*Id.* ¶ 5.)

In *Finch v. Treto*, a case cited by Plaintiffs, the court denied the requested preliminary injunction precisely because of the harm to other potential cannabis licensees. *Finch,* 2022 U.S. Dist. LEXIS 103222, at *51-52. In that case, a recent transplant to Illinois (Finch) and a Pennsylvania resident (Toigo) alleged that Illinois's cannabis licensing criteria violated the Dormant Commerce Clause because they required or prioritized longtime Illinois residents. *Id.* at *34. In March 2022, they sought a preliminary injunction entirely halting a lottery similar to the City's P3RR2 Lottery. *Id.* at *12. Although the district court for the Northern District of Illinois found that the residency requirements violated the Dormant Commerce Clause, it also found that the plaintiffs' request to entirely halt the upcoming lottery would be harmful to the other 937 applicants, in violation of the equitable prohibition on unnecessary harm to third

parties. *Id.* at *52 ("Investments made in reliance on [the state's] process, and put in jeopardy by Plaintiffs' request, are not unreasonable . . . [i]n fact, they are more substantial than any harm Plaintiffs have shown that they are both likely to suffer if an injunction is denied and unlikely to suffer if one is granted.").

The equities here are similar to those in *Finch*. There are 508 verified SEIAs who are depending on the City to conduct the P3RR2 Lottery before the end of 2022 in order to make the deadline to obtain a DCC provisional license. (Killeen Decl. ¶¶ 12, 21, 31-33; Frierson Decl. ¶¶ 5, 6.) Many of these SEIAs, like Jesse Frierson, have undoubtedly made significant investments in their incipient businesses, investments which are all the more significant due to their low-income or disadvantaged socioeconomic status. (*See* Frierson Decl. ¶¶ 5, 6.) All SEIAs have submitted years of paperwork in pursuit of the limited reparations the City can offer to rectify, at least in part, the injustice of a racist drug war. The harms that those 508 individuals will suffer are undoubtedly more substantial than the harms Plaintiffs claim that they will suffer if a TRO is denied. For that reason, even if Plaintiffs satisfy all other criteria, the injunction must be denied.

### 2. Plaintiffs' Delay in Filing Precludes Emergency Injunctive Relief.

The Court should also deny Plaintiffs' requested TRO because they delayed their filing until the proverbial eleventh hour. Although a delay in filing for injunctive relief is not determinative, it "implies a lack of urgency and irreparable harm." *See Vital Pharms., Inc. v. PhD Mktg., Inc.*, No. 220CV06745 RSWL (JCx), 2020 U.S. Dist. LEXIS 208394, 2020 WL 6545995, at *8 (C.D. Cal. Nov. 6, 2020), citing *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) (citations omitted). The longer the plaintiff delays, the less prejudice is necessary to defeat its claim. *See Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

Here, the City's regulatory scheme was enacted in 2017. Plaintiffs knew of it at least as early as July 12 of this year when they applied for verification, many months before the now-imminent P3RR2 Lottery. (Killeen Decl. ¶ 15.) However, they did not notify the City of their intent to file this case until November 1, 2022. If the harm they

seek to avoid were truly irreparable, they could have notified the City earlier. *See AK Metals, LLC v. Norman Indus. Materials, Inc.*, No. 12cv2595-IEG (WVG), 2013 U.S. Dist. LEXIS 13793, 2013 WL 417323, at \*10 (S.D. Cal. Jan. 31, 2013) ("Plaintiff's [two-month] delay in filing the motion ... weighs against the immediacy of the harm.). Their delay weighs heavily against the issuance of a TRO here.

### D.   A TRO is Not in the Public Interest.

The fourth criterion for issuance of a TRO is that it be in the public interest.  As set forth above, there are at least 508 other applicants whose rights would be adversely affected by an injunction halting the P3RR2 Lottery. *See* Section IV.C.1, *supra*. Additionally, the general public would not benefit from an injunction because the primary purpose of the Dormant Commerce Clause does not apply to federally illegal cannabis markets.

Specifically, the purpose of the Dormant Commerce Clause is to preserve competitive interstate markets, but Congress has outlawed the interstate market for cannabis. *Gen. Motors Corp.,* 519 U.S. at 299; 21 U.S.C. §§ 841, 812(c)(Schedule 1)(c)(10); *Raich*, 545 U.S. at 22. As a result, there is no interstate cannabis market to preserve. *Peridot Tree*, 2022 U.S. Dist. LEXIS 190046, at \*26 ("[F]ederal district courts cannot employ their equitable powers if doing so would effectively revisit decisions Congress had already made when it passed the Controlled Substances Act."), citing *United States v. Oakland Cannabis Buyers' Co-Op*, 532 U.S. 483, 497-98 (2001).  As noted by the court in *Peridot Tree*, the federal government's interest in entangling itself with cannabis is, at best, "murky." *Peridot Tree*, 2022 U.S. Dist. LEXIS 190046, at \*23. Thus, for the purposes of this Court's analysis, there is no public interest that could be served by a TRO ordering the City to allow Plaintiffs to engage in an illegal interstate cannabis market.

E.   **If a TRO Must Issue, It Should Require the City to Include Mr. Gay in the Lottery, Rather Than Shutting Down the City's Entire Licensing Program.**

As set forth above, Plaintiffs' TRO Application does not meet the basic criteria for an injunction to issue. However, if the Court nonetheless decides to issue an injunction, it must be narrowly tailored to address Plaintiffs' injury only, without unnecessarily burdening any third parties. It is well settled that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). "The purpose of such interim equitable relief is not to conclusively determine the rights of the parties but to balance the equities as the litigation moves forward." *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018).  It is equally well-settled that "injunctive relief [should] vindicate the rights of the particular plaintiff rather than the rights of third parties." *Chapman v. Pier 1 Imps. (U.S.), Inc.*, 631 F.3d 939, 949 (9th Cir. 2011).

Generally speaking, when confronting a constitutional flaw in a statute, a federal court must "try not to nullify more of a legislature's work than is necessary." *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 329 (2006). It is preferable "to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact." *Id.*; *see also* LAMC § 104.17 (severability clause for the City's cannabis regulations).

Here, if an injunction issues, it should order the City to allow Plaintiffs to participate in the P3RR2 Lottery, rather than halting the Lottery in its entirety. This is a far narrower injunction than the one requested by Plaintiffs, who seek to shut down all cannabis licensing by the City. The narrower injunction, however, comports with the longstanding maxim that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano*, 442 U.S. at 702.  It preserves the status quo while the litigation proceeds. It also avoids burdening

third parties, who might otherwise suffer significant financial losses if the P3RR2 Lottery is halted. *See Finch v. Treto*, No. 22 C 1508, 2022 U.S. Dist. LEXIS 103222, at *51-52. More importantly, it would avoid the potentially irreparable injury to those parties if they were unable to procure a provisional license from the California state DCC. *See* Section IV.C.1, *supra*.

**F.      The PCN Process Should Not Be Subject to a TRO.**

The Court should likewise exclude from a TRO, if one must issue, any relief related to the PCN process. Temporary restraining orders are emergency measures, intended to preserve the status quo pending a fuller hearing on the injunction requested, and the irreparable harm must be clearly immediate. Fed. R. Civ. P. 65(b)(1); *see Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006).

The PCN process does not pose an emergency requiring immediate relief.  No facts are presented in Plaintiffs' application suggesting that the PCN process has started or will start anytime soon. Plaintiffs also concede that they have not yet applied for a license pursuant to the PCN process. (TRO App. at 12.) The City intends to open a new verification process that would allow applicants, including Mr. Gay, to be verified for the next PCN process after the P3RR2 Lottery is completed. (Killeen Decl. ¶¶ 22, 25.) Thus, no emergency is presented by any aspect of the PCN process requiring immediate relief before a noticed motion for a preliminary injunction can be heard. The PCN process must therefore be excluded from any TRO.

**G.      A Bond Sufficient to Compensate the Other SEIAs Must be Required.**

If the Court decides to issue a TRO halting the Lottery, it should also require a bond from Plaintiffs. Fed. R. Civ. P. 65(c).  "Federal Rule of Civil Procedure 65(c) grants district courts wide discretion in settling the amount of a security bond." *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 733 (9th Cir. 1999). Here, the requested TRO would potentially harm the interests of 508 SEIAs, each of whom invested significant time, effort, and resources into their verification applications. These resources include potentially significant initial investments, such as retaining compliant properties.

1  Verified SEIA Jesse Frierson, for instance, stands to lose an initial investment of

2  $10,000. (Frierson Decl. ¶¶ 4, 5.) The Court should therefore impose a bond of $10,000

3  per potentially affected SEIA, for a total of $5,08,000.

4        Plaintiffs will undoubtedly argue that they cannot afford such a bond, as Mr. Gay

5  purports to have a low income. However, Plaintiffs have been less than forthright about

6  the other controlling interest in Variscite. Instead of specifying who that individual is,

7  Plaintiffs omitted that fact in their papers and declarations. Given that material omission

8  and the material omissions in Mr. Gay's verification application to the City (*see* Section

9  IV.A.3), the burden should be on Plaintiffs to disclose who that individual is and what

10  his or her assets are before arguing their inability to pay a bond.

11  **V.    CONCLUSION**

12        For the foregoing reasons, the Court should deny Plaintiffs' TRO Application.

13

14  Dated: Dec. 2, 2022       Respectfully submitted,

15                           **MICHAEL N. FEUER,** City Attorney

16                           **DAVID J. MICHAELSON,** Chief Asst. City Attorney

17                           **TAYLOR C. WAGNIERE,** Deputy City Attorney

                         **KABIR CHOPRA,** Deputy City Attorney

18                           **PATRICK HAGAN,** Deputy City Attorney

19                By: _____

                       **PATRICK HAGAN**

20                Attorneys for Defendants CITY OF LOS ANGELES,

21                which includes the LOS ANGELES DEPARTMENT OF
              CANNABIS REGULATION; AND MICHELLE

22                GARAKIAN, in her official capacity

23

24

25

26

27

28

OPPOSITION TO APPLICATION FOR TEMPORARY RESTRAINING ORDER