# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VARISCITE, INC. AND KENNETH GAY,<br><br>                              Plaintiff,<br><br>          v.<br><br>CITY OF LOS ANGELES; LOS ANGELES DEPARTMENT OF CANNABIS REGULATION; AND MICHELLE GARAKIAN,<br><br>                              Defendants. | Case No. 2:22-cv-08685-SPG-SK<br><br>**ORDER DENYING PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |

        Before the Court is Variscite, Inc.'s and Kenneth Gay's ("Plaintiffs") Application for Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue.  ("Application").  (ECF No. 5 ("App.")).  Having considered the parties' submissions, the relevant law, the record in this case, the matters for which the parties requested this Court take judicial notice (which the Court grants), and the hearing on the Application, the Court DENIES the Application.

## I.    INTRODUCTION

This case involves a challenge to certain municipal code provisions enacted by the City of Los Angeles ("City" or "Los Angeles") that govern the award of storefront retail cannabis business licenses through a lottery and subsequent Public Convenience and Necessity ("PCN") process.  Plaintiff Gay, who is resident of Michigan, and Plaintiff Variscite, a California corporation (collectively, "Plaintiffs"), filed suit asserting that the code provisions favor California residents over out-of-state residents and thus are in violation of the Dormant Commerce Clause of the United States Constitution.  *See* (Complaint ¶¶ 1-2, 11, 13).  On November 30, 2022, Plaintiffs filed an application for a temporary restraining order and order to show cause why a preliminary injunction should not issue, which seeks to enjoin the lottery that the City has scheduled to take place today, December 8, 2022.  Plaintiffs assert that they will be irreparably harmed if the Court does not issue emergency relief.  Defendants, who were served with a copy of the application in advance of the hearing, have filed an opposition arguing on several grounds that emergency relief is inappropriate.  For the reasons set forth below, the Court agrees.

## II.    FACTUAL BACKGROUND

In the 2016 election, California voters adopted Proposition 64, the Control, Regulate and Tax Adult Use of Marijuana Act, 2016 Cal. Legis. Serv. Prop. 64 (west), legalizing in California certain activity involving the use of cannabis by persons 21 years of age or older. *People v. Raybon*, 11 Cal. 5th 1056, 1059, 1059 n.1 (2021).  Subsequently, California "enacted the Medicinal and Adult-Use Cannabis Regulation and Safety Act ("AUMA") to establish a system of control and regulate the . . . sale of both medicinal and recreational cannabis." L.A. Mun. Code § 104.00.   "The AUMA also provided for State licensing of commercial cannabis businesses, starting January 1, 2018[,] . . . [and] requires city approval in order to obtain a State License." *Id.*   The City thus created a licensing system for commercial cannabis related businesses, as well as a Department of Cannabis Regulation and Cannabis Regulation Commission to implement the licensing system and coordinate administration of the system's requirements. *Id.*

A.      The City's Social Equity Program and SEIA Verification Requirement

In 2017, the City enacted its first commercial cannabis laws in anticipation of the decriminalization of certain retail cannabis activities.  *See, e.g.*, L.A. Mun. Code §§ 21.51-52.  The City's licensing program includes a social equity component, referred to as the "Social Equity Program," that is intended to promote equitable ownership of cannabis retail stores and promote employment opportunities in the cannabis industry to decrease disparities for marginalized communities and to address the disproportionate impact on such communities of the prior criminalization of cannabis.  (ECF No. 14-2 ¶¶ 4-5 ("Killeen Decl.")).   Pursuant to the Social Equity Program, the storefront retail, delivery, and cultivation application processes are exclusively available until January 1, 2025, to individuals who have been verified by the City as a Social Equity Individual Applicant ("SEIA").  (*Id.* ¶ 5).  After January 1, 2025, all commercial cannabis application types will be available to all applicants, regardless of whether they meet the SEIA requirements.  (*Id.*).  Thus, to participate in the Social Equity Program, an individual must request verification from the City as a SEIA.

To be verified as a SEIA, an individual must submit evidence of two of the following three criteria ("Verification Criteria"): (a) a qualifying California Cannabis Arrest or Conviction prior to November 8, 2016; and (b)(1) 10 years of residency in a Disproportionately Impacted Area, *or* (b)(2) low income in the 2020 or 2021 calendar year.  L.A. Mun. Code § 104.20(b)(1)(i).  The Los Angeles Municipal Code defines "California Cannabis Arrest or Conviction" to mean "an arrest or conviction in California for any crime under the laws of the State of California or the United States relating to the sale, possession, use, manufacture, or cultivation of Cannabis that occurred prior to November 8, 2016."  L.A. Mun. Code § 104.20(b)(1)(ii)(3).  This criterion may be evidenced by arrest records, court records, or other official government documents which identify the relevant statute or crime.   (Killeen Decl. ¶ 6(a)).   The Los Angeles Municipal Code defines "Disproportionately Impacted Area" ("DIA") to mean "Police Reporting Districts [("PRD")] as established in the Expanded Social Equity Analysis, or as established using

1   the same methodology and criteria in a similar analysis provided by an Applicant for an
2   area outside of the City." L.A. Mun. Code § 104.20(b)(1)(ii)(4).

3        The Expanded Social Equity Analysis is a report commissioned by the Los Angeles
4   City Council to identify areas within the City that have greater than the mean number of
5   cannabis-related arrests for the City and are composed of 60 percent or more of "Low
6   Income" households. *See* (ECF No. 5-3).  Residence in a DIA can be shown with at least
7   one document per year of residency, including but not limited to: school transcripts, leases,
8   utility bills, phone bills, government issued identification cards, dated banks statements,
9   tax returns, financial statements, voter registration, government or court documents,
10  vehicle registration, home-related paperwork, insurance documents, and pay stubs.
11  (Killeen Decl. ¶ 6(b)).  "Low Income" means both of the following: "(1) the Social Equity
12  Individual Applicant meets the low-income threshold established in the annual U.S.
13  Department of Housing and Urban Development (HUD) income limit based upon the Area
14  Median Income (AMI) for Los Angeles County based on household size; and (2) the Social
15  Equity Individual Applicant does not have Assets in excess of the amount as defined in this
16  subsection." L.A. Mun. Code § 104.20(b)(1)(ii)(5).  This criterion may be evidenced by:
17  (i) a complete tax return, including all schedules, for calendar year 2020 or 2021; and (ii)
18  the City's Asset Attestation Form showing net assets at or below four times the relevant
19  thresholds, based on household size. L.A. Mun. Code § 104.20(b)(1)(ii)(1); (Killeen Decl.
20  ¶ 6(c)).

21       **B.     Phase 3 Retail Round 2 ("P3RR2 Lottery)**
22       Los Angeles' next planned application phase is for storefront retail applications.
23  (Killeen Decl. ¶ 7).  In this next phase, the City will identify SEISs who are eligible to
24  submit retail storefront applications through a random selection process, called the P3RR2
25  Lottery (hereinafter, the "Lottery").  (*Id.*); L.A. Mun. Code § 104.06.1(c).  The City plans
26  to conduct the Lottery later today, December 8, 2022.  (Killeen Decl. ¶ 9).  To participate
27  in the Lottery, individuals must already be verified as a SEIA with a California Cannabis
28

Arrest or Conviction, and either one of the remaining criteria. (Killeen Decl. ¶ 10); L.A. Mun. Code § 104.06.1(c)(3).

In anticipation of the Lottery, the City accepted verification submissions between May 26, 2022, and July 25, 2022. (Killeen Decl. ¶ 11). As part of a request for verification, individuals were required to submit documentation evidencing that they met the Verification Criteria. (*Id.*). On July 25, 2022, the period for submitting eligibility verification requests closed, and incomplete and/or deficient submissions could not be corrected, supplemented, or otherwise modified. (*Id.* ¶ 13). The City received approximately 1,139 unique eligibility verification requests, which the City reviewed. (*Id.* ¶¶ 12-13). Of the requests received, the City verified 516 applicants to participate in the lottery. (*Id.* ¶ 12). Of the 516 applicants, 508 applicants are currently registered to participate in the lottery. (*Id.* ¶ 21).

### C. PCN Process

In addition to the lottery process, storefront retail license opportunities are available through the City's Public Convenience and Necessity ("PCN") process. (*Id.* ¶ 23). PCN applications are available in Community Plan Areas of the City which have reached or surpassed the permissible number of retail storefront licenses based on population size. (*Id.*); L.A. Mun. Code § 104.03(a)(4). A PCN application requires approval of the Los Angeles City Council before an application may be processed. *Id.* PCN applicants must be verified SEIAs. (Killeen ¶ 24). However, unlike the Lottery, SEIAs applying for the PCN process do not need a California Cannabis Arrest or Conviction. (*Id.*).

#### 1. Plaintiff Gay's Rejected SEIA Application

Plaintiff Gay has lived in Michigan "nearly" his entire life. (ECF No. 5-1 ¶ 5 ("Gay Decl.")). He has never lived in California, owns no property in California and has never been arrested or convicted of a cannabis-related crime in California. *See* (*id.* ¶¶ 5, 8-9). Mr. Gay owns a 51% stake in Plaintiff Variscite, Inc. (*Id.* ¶ 4). On July 12, 2022, Plaintiffs applied to be verified as a SEIA for the Lottery. (App. at 11); (Killeen Decl. ¶ 15). According to Plaintiff Gay, he "satisfies all three of the requirements" to become a SEIA,

"except that the relevant events occurred in Michigan rather than California." (App. at 11). According to the City, Plaintiff's application was ultimately rejected for failing to satisfy *any* of the Verification Criteria. *See* (Killeen Decl. ¶ 16).

### D.   Procedural History

On November 30, 2022, Plaintiffs filed a complaint against the City of Los Angeles, Los Angeles Department of Cannabis Regulation, and Michelle Garakian, Interim Executive Director of the Department of Cannabis Regulation (collectively, "Defendants"), asserting the following causes of action: (1) 42 U.S.C. § 1983, alleging that the Lottery violates the Dormant Commerce Clause of the United States Constitution, *see* (ECF No. 1 ¶¶ 35-39 ("Compl.")); (2) a Declaratory Judgment pursuant to 28 U.S.C. § 2201, requesting the Court declare that the Lottery violates the Dormant Commerce Clause of the United States Constitution, *see* (*id.* ¶¶ 40-42); (3) 42 U.S.C. § 1983, alleging that the PCN violates the Dormant Commerce Clause of the United States Constitution, *see* (*id.* ¶¶ 43-47); and (4) a Declaratory Judgment, pursuant to 28 U.S.C. § 2201, requesting the Court declare that PCN violates the Dormant Commerce Clause of the United States Constitution, *see* (*id.* ¶¶ 48-50).

That same day, Plaintiffs filed the instant Application. (App.). Plaintiffs argue the SEIA Verification Criteria violates the Dormant Commerce Clause on the following grounds: (1) "California citizens are more likely than out-of-state citizens to have a California Arrest or California Conviction. Thus, the [SEIA's "California Cannabis Arrest or Conviction" requirement] favors California citizens over out-of-state citizens; and (2) by forcing out-of-state applicants to submit an analysis similar to that provided in the Expanded Social Equity Analysis in order to qualify as a "Disproportionately Impacted Area," Defendants have "set[] a requirement beyond the reach of potential Social Equity Individual Applicants from outside of Los Angeles . . . ." (App. at 15-17). Plaintiffs also assert that emergency relief is justified because the Lottery will be taking place this afternoon. *See* (*id.* at 6).

1   Defendants filed an opposition to the Application. (ECF No. 14 ("Opp.")).
2   Defendants argue that Plaintiffs are unlikely to succeed on the merits for a variety of
3   reasons. Most relevant to the Court's decision, Defendants assert that Plaintiffs lack
4   standing to challenge the Social Equity Program. (Opp. at 22-25).
5        The Court set the matter for hearing on December 6, 2022, but the parties stipulated
6   to move the hearing to the afternoon of December 7, 2022, at which time the Court heard
7   oral argument then took the matter under submission. The Court notified the parties via
8   minute order on December 7, 2022, that the Application was denied with a written opinion
9   to follow.

10  **III.   LEGAL STANDARD**

11       A temporary restraining order is "an extraordinary remedy that may only be awarded
12  upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*,
13  555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per
14  curiam*)). The purpose of a temporary restraining order is to preserve the status quo before
15  a preliminary injunction hearing may be held. *Granny Goose Foods, Inc. v. Bhd. of
16  Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974). The standard for issuing a
17  temporary restraining order is essentially the same as that for issuing a preliminary
18  injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7
19  (9th Cir. 2001) (stating that the analysis for temporary restraining orders and preliminary
20  injunctions is "substantially identical"). Under *Winter*, a plaintiff may secure a temporary
21  restraining order only if he establishes: (1) he is likely to succeed on the merits, (2) he is
22  likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of
23  equities tips in his favor, and (4) an injunction is in the public interest. *Farris v. Seabrook*,
24  677 F.3d 858, 864 (9th Cir. 2012) (citing *Winter*, 555 U.S. 7, 20 (2008)). "'[S]erious
25  questions going to the merits' and a hardship balance that tips sharply towards the plaintiff
26  can support issuance of a preliminary injunction, so long as the plaintiff also shows that
27  there is a likelihood of irreparable injury and that the injunction is in the public interest."
28  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). "In each

case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (citing *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)). "'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Id.* (citing *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982)).

As the parties acknowledged at the hearing, in deciding an application for a temporary restraining order, the court is permitted to consider the parties' pleadings; declarations, affidavits, and exhibits submitted in support of and in opposition to the application. *See Earth Island Inst. v. Nash*, No. 1:19-cv-01420-DAD-SAB, 2020 WL 1936701, at *6 (E.D. Cal. Apr. 21, 2020) ("[I]n considering a motion for a preliminary injunction, a court may consider and rely upon declarations, affidavits, and exhibits submitted by [both] parties." (citations omitted)); *Harper v. Poway Unified Sch. Dist.*, 345 F. Supp. 2d 1096, 1119-20 (S.D. Cal. 2004) (considering declarations submitted by defendants to deny plaintiff's request for a preliminary injunction); *BOKF, NA v. Estes*, 299 F. Supp. 3d 1117, 1122 (D. Nev. 2018). "The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984) (citations omitted). The urgency of the relief sought necessitates a prompt determination and can make it difficult to obtain admissible evidence. *Id.* As one judge in this district so aptly observed:

> Speed is often extremely important in proceedings for restraining orders and temporary injunctions, and both the movant and the opposing party are often unable to obtain and marshal their evidence in a manner that would be proper for a summary judgment hearing or for an actual trial. . . . [T]he court may properly consider affidavits at preliminary injunction hearings which do not measure up to the standards of the summary judgment affidavits.

*Kennedy For & on Behalf of the N.L.R.B. v. Sheet Metal Workers Intern. Ass'n Local 108*, 289 F. Supp. 65, 90-91 (C.D. Cal Aug. 1, 1968). Further, "the district court 'is not bound

to decide doubtful and difficult questions of law or disputed questions of fact.'" *Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson*, 799 F.2d 547, 551 (9th Cir.1986) (quoting *Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir.1964)).

Finally, per Rule 65(c), "[t]he court may issue . . . a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

## IV.  DISCUSSION

### A.  Plaintiffs Lack Standing

The preliminary issue is whether Plaintiffs have Article III standing to seek emergency equitable relief in this Court.  To invoke federal jurisdiction, Article III of the Constitution requires that there be a case or controversy.  U.S. Const. art. III, § 2.  The doctrine of standing, a part of the case-or-controversy requirement, is a fundamental prerequisite to obtaining any relief, equitable or otherwise, in federal courts.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Standing "focuses on the party seeking to get his complaint before a federal court and not on the issue he wishes adjudicated." *Flast v. Cohen*, 392 U.S. 83, 99 (1968).  The "irreducible constitutional minimum" of Article III standing requires a plaintiff invoking federal jurisdiction to show that it has: (1) "suffered an injury in fact," (2) "that is fairly traceable to the challenged conduct of the defendant," and (3) "that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins (Spokeo II)*, 578 U.S. 330, 338 (2016).  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo II*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).  The requirement of being fairly traceable to the challenged conduct stated another way means "there must be a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. For the injury to be redressable, "it must be likely, as opposed to merely speculative, that

1   the injury will be redressed by a favorable decision." *Id.* (internal quotations omitted).

2   "The party invoking federal jurisdiction bears the burden of establishing these elements."

3   *Id.* at 561 (citations omitted).

4          Here, Plaintiffs argue they will suffer harm unless the Court enjoins the challenged

5   aspects of the Lottery and PCN process.  (App. at 7, 18-20).  Defendants argue that

6   Plaintiffs lack Article III standing to challenge the purportedly unconstitutional aspects of

7   the SEIA's Verification Criteria.  They assert that, although Plaintiffs elected to submit

8   evidence to establish all three of the Verification Criteria, Plaintiffs "(1) failed to submit

9   documentation showing a qualifying cannabis conviction (regardless of which state the

10  conviction occurred in)"; "(2) failed to submit documentation showing ten years' residence

11  in a DIA (even if his area of residence were deemed a DIA)"; and "(3) failed to submit

12  evidence that [Plaintiff Gay] is "low-income" under federal HUD standards."  (Opp. at 22).

13  In other words, Defendants argue that Plaintiffs cannot show the causation or redressability

14  criteria of Article III standing because the unchallenged provisions of the Social Equity

15  Program would nevertheless inflict the same injury on Plaintiffs by barring their SEIA

16  verification and thus, a favorable ruling would still not remedy Plaintiff's alleged injury.

17  (*Id.*).  The Court agrees.

18         A plaintiff challenging the validity of a statutory provision cannot establish either

19  causation or redressability where another statutory provision not subject to challenge would

20  cause the plaintiff to continue to suffer the same injury.  *Orion Wine Imps., LLC v.*

21  *Appelsmith ("Orion")*, 837 Fed. Appx. 585 (9th Cir. 2021).  In *Orion*, the plaintiffs were

22  Floridian wine distributors who sought to challenge Section 23661 of California's

23  Alcoholic Beverage Control Act ("ABC") under the Dormant Commerce Clause.  *Id.*

24  Before the district court, the plaintiffs sought a judgment declaring Section 23661

25  unconstitutional, enjoining it from being enforced, and requiring the defendant to allow

26  plaintiffs to sell and deliver wine directly to California retailers.  *See Orion*, 440 F. Supp.

27  3d 1139, 1146 (E.D. Cal. Feb. 19, 2020).  On appeal, the Ninth Circuit affirmed the district

28  court's conclusion that the plaintiffs lacked standing because the wine distributor-plaintiffs

could not show either causation or redressability.  *Orion, 837 Fed. Appx.* at 586.  In particular, the Ninth Circuit found that "the fatal flaw for Plaintiffs' challenge under both requirements is that *other independent provisions of the ABC Act, which Plaintiffs do not challenge, would still prohibit Plaintiff's proposed transaction with The Pour House even if Section 23661 were invalidated*."  *Id.* at 586 (emphasis added); *see also McConnell v. FEC*, 540 U.S. 93, 228 (2003) (holding challengers to section 307 of Bipartisan Campaign Reform Act ("BCRA") lacked standing because they would continue to suffer same injury due to section 315 of Federal Election Commission Act whether or not BCRA section 307 could be enforced); *Nuclear Info. & Res. Serv. v. Nuclear Reg. Comm'n.*, 457 F.3d 941, 955 (9th Cir. 2006) (finding no standing where challenge to NRC rulemaking would not invalidate Department of Transportation regulation with same effect.); *San Diego Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996) (finding no causation or redressability where challenged law was not the only factor raising price of firearms).

Here, Plaintiffs have failed to demonstrate that their supposed constitutional injury is either caused solely by the challenged provisions of the Verification Criteria or that their injury is redressable by declaring this Verification Criteria unconstitutional because Plaintiffs' SEIA application was denied for failing to satisfy other *unchallenged* and independent SEIA Verification Criteria requirements.  In a declaration filed in support of Defendants' opposition, Jason Killeen, Assistant Executive Director of the City of Los Angeles Department of Cannabis Regulation, explains that "[b]ased on the records submitted, [Plaintiffs] did not satisfy *any* of the Verification Criteria."  (Killeen Decl. ¶ 16 (emphasis added)).  In particular, although Mr. Gay submitted an Asset Attestation Form to obtain SEIA verification under the Low-Income provision that Plaintiffs are not challenging, he failed to fully disclose his assets and income, thus disqualifying him as a Low-Income applicant.  Mr. Killeen explains that Mr. Gay submitted incomplete income documentation because Mr. Gay did not disclose at least three material facts on the Asset

Attestation Form.[1]   (*Id.* ¶ 16(b)).   Specifically, Mr. Gay could not be verified for the following reasons: (1) Schedule C of Mr. Gay's 2020 tax return reveals that there are assets associated with his construction company, including vehicles, equipment, and/or tools, that are not disclosed on his Asset Attestation Form, (*Id.* ¶ 16(b)(ii)); (2) California Secretary of State public records show that Mr. Gay possesses a 51% equity stake (51,000 shares) in Variscite, Inc., but this information was not disclosed on Mr. Gay's Asset Attestation Form, (*Id.* ¶ 16(b)(ii)); and (3) Mr. Gay's litigation in other jurisdictions demonstrates that he has business interests in entities other than Variscite, Inc., including Peridot Tree, Inc. and Variscite NY One, Inc.  *See, e.g.*, *Peridot Tree, Inc. v. City of Sacramento*, No. 2:22-cv-00289-KJM-DB, 2022 WL 10629241, at *1 (E.D. Cal. Oct. 17, 2022).  Yet, Mr. Gay failed to disclose these assets as well.  *See* (Killeen ¶ 16(b)).  Importantly, the failure to disclose these material facts provided a sufficient basis to deny Mr. Gay's application.  The Asset Attestation Form states that the "submission of false or misleading information or the failure to disclose material facts may result in the denial of [a] Social Equity Individual Applicant eligibility verification request, or the subsequent denial of an application.  (*Id.* ¶ 16(b)(i), Ex. A).

Additionally, Plaintiffs failed to satisfy the component of the Disproportionately Impacted Area requirement that applicants submit sufficient evidence showing 10 years of cumulative residency.  According to Mr. Killeen, Plaintiff Gay "did not submit enough records to evidence 10 years of cumulative residency in *any* location."  (*Id.* ¶ 16(c)) (emphasis added).  Rather, Mr. Killeen explains that Plaintiffs submitted five sufficient records which evidence only five years of residence in a potential DIA.  (*Id.* ¶ 16(c)(ii)).[2]

---

[1] During the hearing, Plaintiffs' counsel did not dispute the representations made by the Killeen declaration concerning the issues with Plaintiff Gay's Asset Attestation Form. Instead, he described the perceived deficiencies as merely "nit-picking."

[2]

-12-

Accordingly, because Plaintiffs have not shown that their alleged injury would likely be redressed by a favorable decision from this Court on the aspects of the Verification Criteria they challenge - given that they still would not be eligible for SEIA verification due to their failure to satisfy the requirements of the unchallenged provisions - Plaintiffs have not met their burden to show they have standing to pursue the emergency relief they seek. However, because Plaintiffs are seeking emergency relief, the Complaint in this case was filed just eight days ago and, as such, the record is not sufficiently developed, the Court, in an abundance of caution, will also address whether Plaintiffs have otherwise shown issuance of a temporary restraining order is appropriate.

**B.    A Temporary Restraining Order is Not Warranted**

As stated previously, under *Winter*, a plaintiff seeking a temporary restraining order must establish: (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and



(4) an injunction is in the public interest.  *Farris*, 677 F.3d at 864 (citing *Winter*, 555 U.S. at 20).

Here, although Plaintiffs' Application raises serious questions regarding the merits of their claims, that factor, as well as the remaining requirements necessary to justify issuance of a temporary restraining order, weigh in favor of denying emergency relief.

        1.    *Likelihood of Success on the Merits*

           a.    *The merits*

The Commerce Clause provides that "the Congress shall have Power . . . to regulate Commerce . . . among the several States."  Art. I, § 8, cl. 3.  Though phrased as a grant of regulatory power to Congress, the Clause has long been understood to have a "negative" aspect that denies the States the power to unjustifiably discriminate against the interstate flow of articles of commerce.  *See, e.g.*, *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992); *Welton v. Missouri*, 91 U.S. 275 (1876).  This implied negative aspect has been named the "dormant Commerce Clause."  *See Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994) (citing *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992)).  "The 'central rationale' of the dormant Commerce Clause 'is to prohibit state or municipal laws whose object is local economic protectionism.'"  *S.D. Myers, Inc. v. City & Cty. of San Francisco*, 253 F.3d 461, 466 (9th Cir. 2001) (quoting *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994)).  In considering a dormant Commerce Clause claim, the court must first determine "whether the statute directly burdens interstate commerce or discriminates against out-of-state interests," in which case the law is "virtually per se invalid and the [c]ourt applies the strictest scrutiny."  *LensCrafters, Inc. v. Robinson*, 403 F.3d 798, 802 (6th Cir. 2005) (internal quotation marks omitted); *see also Nat'l Ass'n of Optometrists & Opticians v. Brown (Nat'l Ass'n of Optometrists I)*, 567 F.3d 521, 524 (9th Cir. 2009) ("Laws that discriminate against out-of-state entities are subject to strict scrutiny.").  "A statutory scheme can discriminate against out-of-state interests in three different ways: (a) facially, (b) purposefully, or (c) in practical effect."  *Nat'l Ass'n of Optometrists I*, 567 F.3d at 525 (internal quotation marks omitted); *see also Chinatown*

*Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1145 (9th Cir. 2015) (strict scrutiny applies if the challenged action "directly regulates or discriminates against interstate commerce, or its effect is to favor in-state economic interest over out-of-state interest." (alteration and citation omitted)).  But if the law "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  The party challenging legislation on dormant Commerce Clause grounds bears the initial burden of showing discrimination*. Int'l Franchise Ass'n v. City of Seattle*, 803 F.3d 389, 400 (9th Cir. 2015).

### i.    *Facial Discrimination*

Defendants argue that "[t]he SEIA requirements do not discriminate against out-of-state residents" because "[n]one of the requirements are expressly limited to California residents."  (Opp. at 19).  The Court tends to agree.  The Los Angeles Municipal Code defines "California Cannabis Arrest or Conviction" to mean "*an arrest or conviction in California* for any crime under the laws of the State of California or the United States relating to the sale, possession, use, manufacture, or cultivation of Cannabis that occurred prior to November 8, 2016."  LAMC 104.20(b)(1)(ii)(3) (emphasis added).  By its terms, this does not require the applicant to have been a California resident currently or at the time of arrest; rather, this language merely requires the applicant to have either an arrest or conviction in California prior to November 8, 2016.  Indeed, according to Defendants, "[m]ultiple non-California residents were successfully verified to participate in the P3RR2 Lottery." (Killeen Decl. ¶ 19).  Additionally, the Los Angeles Municipal Code defines "Disproportionately Impacted Area" ("DIA") to mean [PRDs] as established in the Expanded Social Equity Analysis, *or as established using the same methodology and criteria in a similar analysis provided by an Applicant for an area outside of the City*." LAMC 104.20(b)(1)(ii)(4) (emphasis added).  Thus, the Verification Criteria does not facially discriminate against out-of-state residents.

|    |   |
|----|---|
| 1  | *ii.*     *Disparate Impact* |
| 2  | However, "[t]he most common form of discrimination against interstate commerce |
| 3  | is disparate impact: the 'differential treatment of in-state and out-of-state economic |
| 4  | interests that benefits the former and burdens the latter.'" *Rosenblatt v. City of Santa* |
| 5  | *Monica*, 940 F.2d 439, 448 (9th Cir. 2019) (quoting *Or. Waste Sys., Inc.*, 511 U.S. at 99). |
| 6  | "The Supreme Court has also found discrimination when a law imposes costs on out-of- |
| 7  | staters that in-state residents would not have to bear." *Id.* (citing *Hunt v. Wash. State Apple* |
| 8  | *Advert. Comm'n*, 432 U.S. 333, 350-51 (1977)); *see also Locke v. Shore*, 634 F.3d 1185, |
| 9  | 1193 (11th Cir. 2011) ("Courts also [have] looked to whether the state statute imposes costs |
| 10 | on out-of-state residents that instate residents do not have to bear." (citation omitted)). |
| 11 | "Further, 'local regulations that treat out-of-staters in a disparate manner will be treated as |
| 12 | discriminatory even though they also discriminate against those in other parts of that |
| 13 | state.'" *Id.* (quoting Erwin Chemerinsky, Constitutional Law: Principles and Policies, § |
| 14 | 5.3.4, at 475 (6th ed. 2019)). |

Here, the Court finds that the SEIA's "Disproportionately Impacted Area" requirement may have sufficiently disparate impact to merit strict scrutiny under the dormant Commerce Clause. Per its terms, applicants currently residing in a Los Angeles-based PRD are not required to conduct any form of social equity analysis prior to submitting a SEIA application. On the other hand, any individual residing outside of a PRD is required to, at a minimum, submit a social equity analysis "using the same methodology and criteria . . . ." as the Expanded Social Equity Analysis. LAMC 104.20(b)(1)(ii)(4). Given the substantial effort, time, and cost likely associated with the City's efforts in generating the Expanded Social Equity Analysis,[3] the Court finds that

---

[3] In the wake of Los Angeles passing an initiative to authorize the City to tax, license and regulate commercial cannabis activity, in June of 2017, the City Council instructed various City departments to solicit a social equity analysis which, among other directives, included the prioritization of individuals who live or have lived in communities that were subject to high drug arrest rates. (ECF No. 5-3 at 5). On October 18, 2017, the City Legislative Analysist provided the City Council with its first Cannabis Social Equity Analysis ("2017

Analysis"). (*Id.*). The 2017 Analysis identified criteria associated with individuals and communities disproportionately impacted by "cannabis-related arrests" and the war on drugs. (*Id.*). (ECF No. 5-6 at 21-22). Further, the 2017 Analysis sought to provide a comprehensive view of the geographic distribution of arrests and Low-Income households across the City by Police Reporting District ("PRD"). *See* (*id.*). PRDs are the smallest administrative unit used by the Los Angeles Police Department ("LAPD"), with over 1,200 PRDs across the City. (ECF No. 5-3 at 5).

The 2017 Analysis considered LAPD cannabis-related arrest data from 2000 to 2016, the 2015 American Community Survey ("ACS") income data, and 2010 Decennial Census race and ethnicity data by PRD. *See* (ECF No. 5-3 at 5-6). To determine whether a PRD qualified under the Social Equity Program, each was evaluated against a Community of Comparison (i.e., Los Angeles), the larger geographical area that represents the general population of the entire community. (*Id.* at 6). In particular, whenever the percentage of Low-Income households and number of cannabis-related arrests in a PRD was substantially greater than that of Los Angeles as a whole, it was recommended that the City select it for inclusion in the Social Equity Program. (*Id.*). To determine which areas were subject to high cannabis arrest rates, the number of cannabis-related arrests in each PRD from 2000 to 2016 was calculated. (*Id.*). The median number of arrests per PRD for the City was 714 and the mean was 72. (*Id.*). After considering the 2017 Social Equity Analysis, the City identified 33 qualifying PRDs. (*Id.* at 7).

Shortly thereafter, the City amended its municipal code to define "Disproportionately Impacted Area" to mean "eligible *Zip Codes* based on" the 33 PRDs with both a greater number of cannabis-related arrests (more than 1.5 standard deviations above the mean number of arrests) than the City overall, and with 60 percent low income households. *See* (*id.* at 6-7 (emphasis)). The extrapolation from the smaller PRDs to the larger Zip Codes increased the geographical scope of the Social Equity Program to include portions of the City outside of the PRDs originally identified in the 2017 Analysis. (ECF No. 5-3 at 7). In all, 19 Zip Codes were incorporated into the Social Equity Program. (*Id.*).

On or around 2020, the Los Angeles City Council requested the same consulting firm to submit an Expanded Social Cannabis Equity Analysis ("Expanded Analysis"). (*Id.* at 4). This Expanded Analysis evaluated which Zip Codes were adversely impacted by the war on drugs within the San Fernando Valley, Boyle Heights Community, and longstanding residential enclaves in downtown Los Angeles. (*Id.* at 4). In particular, the Expanded Analysis sought to determine which of these areas deserved inclusion within the Municipal Code's definition of "Disproportionately Impacted Area" for purposes of the Social Equity Program. (*Id.*). The Expanded Analysis also reviewed the effects of gang injunction areas with respect to the war on drugs in Los Angeles and also considered whether these additional areas deserved inclusion within the "Disproportionately Impacted Area" definition. (*Id.*).

satisfaction of the Social Equity Analysis criterion imposes a potentially significant cost to out-of-state, low-income applicants, that is not born by similarly situated Los Angeles-based applicants.  The Court thus concludes that Plaintiffs, at a minimum, have raised serious questions on the merits of their claim regarding the constitutionality of the challenged provisions.

b.   *Serious Question Impeding a Decision on the Merits*

Notwithstanding, as stated previously, the Court has countervailing serious questions regarding the Plaintiffs' standing to pursue their claims as currently alleged.

---

The Expanded Study analyzed 1,212 different PRDs across Los Angles, along with 89,553 different cannabis-related arrests recorded by the LAPD from 2000 to 2016.  *See* (*id.* at 7).  Of the 1,212 PRDs for which cannabis arrest records were recorded, 330 PRDs included greater than 72 cannabis-related arrests, the citywide mean arrest count value.  (*Id.* at 7).  Cannabis-related arrests recorded in these identified PRDs totaled 58,569 of the citywide value of 89,553 arrests.  (*Id.*).  Finally, of the 330 PRDs with greater than the citywide mean number of cannabis-related arrests, 151 PRDs were found to meet the 60 percent or greater Low-Income threshold used in the 2017 Analysis.  (*Id.* at 8).  Thus, the Expanded Analysis recommended that the City revise its definition of "Disproportionately Impacted Area" to be based on 151 different PRDs identified in the Expanded Study, rather than the 19 Zip Codes referenced in the 2017 Analysis.  (*Id.*).  This definition was accepted by the City and codified as Los Angeles Municipal Code, section 104.20(b)(1)(ii)(4).

To reiterate: the Los Angeles Municipal Code defines "Disproportionately Impacted Area" ("DIA") to mean [PRDs] as established in the Expanded Social Equity Analysis, *or as established using the same methodology and criteria in a similar analysis provided by an Applicant for an area outside of the City*."  L.A. Mun. Code § 104.20(b)(1)(ii)(4) (emphasis added).  Thus, in order for an out-of-state applicant to meet this requirement, the applicant is assumedly obligated to: (1) record every arrest that occurred from 2000 to 2016 for Possession of Marijuana, Cultivation/Processing of Marijuana, Possession of Marijuana for Sale, Transportation of Marijuana, and Driving while in Possession of Marijuana in their city; (2) separate this data by PRD (or equivalent unit of geographical measure); (3) calculate the mean of cannabis-related arrests by PRD; (4) determine whether their PRD's total number of cannabis-related arrests exceeds the calculated mean number value; and (5) determine whether their PRD meets the 60 percent or greater Low-Income threshold, as derived from the annual HUD income limit based upon the AMI for their county according to household size.

Those issues not only inhibit Plaintiffs' ability to obtain the emergency relief they currently seek, but also call into question whether the Court would ever reach the merits of this case were the matter to proceed at a more normal pace.

Additionally, the issues presented by the fact of this suit are sufficiently novel that they raise serious questions regarding whether the Court should ultimately abstain from deciding those issues before the Ninth Circuit has an opportunity to weigh in.   As previously discussed, "the dormant Commerce Clause's fundamental objective [is to] preserve[] a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997).   However, there is no national market for medicinal or recreational cannabis.   To the contrary, the production, sale, and recreational use of cannabis remains illegal under federal law.   *See Gonzales v. Raich*, 545 U.S. 1, 8 (2005); 21 U.S.C. §§ 812(c)(c)(1), 841.   For this reason, this case presents a novel issue to this Circuit and for most of these United States: whether the dormant Commerce Clause extends to the interstate trade of a federally criminalized good: cannabis.   Defendants cite the recent decision in *Peridot Tree* for the proposition that this Court should abstain from rendering a decision on this constitutional issue.   *See* (Opp. at 14-17 (citing 2020 WL 10629241)).

Abstention doctrines represent limited exceptions to the federal court's "virtually unflagging obligation" to exercise the jurisdiction that has been given to them.   *See Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).   For example, *Young* abstention "is a jurisprudential doctrine rooted in overlapping principles of equity, comity, and federalism," *San Jose Silicon Valley Chamber of Com. Pol. Action Comm. v. City of San Jose*, 546 F.3d 1087, 1091 (2008) (citations omitted), which "counsels federal court abstention when there is a pending state proceeding, [and] reflects a strong policy against federal intervention in state judicial processes in the absence of great and immediate irreparable injury to the federal plaintiff." *Moore v. Sims*, 442 U.S. 415, 423 (1979) (citation omitted).   However, "abstention from the exercise of federal jurisdiction is the exception, not the rule." *Colo. River Water Conservation Dist.*, 424 U.S. at 813; *City of*

*San Jose*, 546 F.3d at 1091.  "The doctrine of abstention . . . is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest."  *Colo. River Water Conservation Dist.*, 424 U.S. at 813 (quoting *Cnty. of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188-89 (1959)).  Courts typically place the burden of establishing the applicability of an abstention doctrine on the party opposing the exercise of federal jurisdiction.  *See, e.g.*, *Commc'ns Telesystems Int'l v. California Public Utility Comm'n*, 196 F.3d 1011, 1020 (9th Cir. 1999) (placing burden of proof on party seeking to evoke abstention).

In *Peridot*, the plaintiffs (which included the very same Kenneth Gray suing in this case) argued that the City of Sacramento's commercial cannabis licensing scheme violated the dormant Commerce Clause.  *See* 2020 WL 10629241, at *1-*2.  Like Los Angeles' Social Equity Program, Sacramento's Cannabis Opportunity Reinvestment and Equity ("CORE") program sought to reduce "barriers of entry and participation" in the cannabis industry to those who were negatively impacted by the War on Drugs.  *Id.* at *1.  To earn a "storefront cannabis dispensary" permit under the CORE program, an applicant was required to fit within one of five defined "classifications."  *Id.*  Plaintiff's cause of action targeted two of these classifications:

> **Classification 1**. A current or former resident o the City of Sacramento who previously resided or currently resides in low-income household and was either: a) arrested or convicted for a cannabis related crime in Sacramento between the years 1980 and 2011; or is b) an immediate family member of an individual described in subsection a of classification 1 or classification 2.

> **Classification 2**.  A current or former resident of the City of Sacramento who has lived in a low-income household for at least five (5) years, between the years of 1980 and 2011 in [nine listed zip codes][.]

*Id.* Both required applicants to be a current or former Sacramento resident. *Id.* For this reason, Mr. Gay argued that "the City's program is unconstitutional because it discriminates against out-of-state applicants in violation of the" dormant Commerce Clause. *Id.* at *2.

After conducting an extensive analysis of various potentially applicable abstention doctrines, the history of California's commercial cannabis legalization efforts leading up to and including Proposition 64, what the court described in contrast as the federal government's "ambiguous marijuana enforcement policies," and the "odd fit" of marijuana cases within the normal Dormant Commerce Clause jurisprudence, the court in *Peridot*, found that abstention from the issue was "the wisest course in these circumstances." *Id.* at *6, 9-11.   In doing so, the Eastern District acknowledged that the case did "not fit neatly within any single abstention doctrine the Supreme Court has recognized." *Id.* at *4. Nonetheless, the court noted that "[t]he [Supreme] Court has held [] that these doctrines are not 'rigid pigeonholes in which federal courts must try to fit cases.'" *Id.* (quoting *Penzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 12 n.9 (1987)).[4]

Nevertheless, Plaintiffs raise several arguments for why the Court should ignore the reasoning of *Peridot* and thus, not abstain from addressing the case's central issue.   First, Plaintiffs cite several cases for the proposition that "numerous other federal courts have struck down cannabis licensing laws that require or favor local residents."   (Opp. at 21 (citing *Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Maine*, 45 F.4th 542 (1st Cir. Aug. 17, 2022); *Toigo v. Dep't of Health & Senior Servs.*, 549 F. Supp. 3d 985, 990 (W.D. Mo. 2021); *Ne. Patients Grp. v. Maine Dep't of Admin. & Fin. Servs.*, 554 F. Supp. 3d 177 (D. Me. 2021); *Lowe v. City of Detroit*, 544 F. Supp. 3d 804, 813 (E.D. Mich. 2021); *NPG, LLC v. City of Portland, Maine*, No. 2:20-CV-00208-NT, 2020 WL 4741913,

---

[4] On or about November 17, 2022, an appeal was filed in the *Peridot* case and the matter is currently pending before the Ninth Circuit, Case No. 22-16783.

at *6 (D. Me. Aug. 14, 2020)).  However, none of these cases addressed whether a federal court should have abstained from addressing the central issue in the first place.

Second, Plaintiffs argue that this Court should disregard *Peridot,* simply stating: "[t]hat order is wrong on the facts, law, and policy, and it will be appealed."  (Mot. at 21).  Plaintiffs did not offer in its briefing or during oral argument any specific legal reasons why this Court should disregard *Peridot's* reasoning.  *See* (*id.*).  However, Plaintiffs have attempted to factually differentiate this case from *Peridot*, arguing: "In this case, Plaintiffs do not ask the Court to open Los Angeles' borders to out-of-state sellers, as the borders are already open," and "[t]here is no conflict with the Controlled Substances Act because Plaintiffs do not seek damages."  (*Id.* at 22).  Neither of these distinguishing facts relate to the principal reasons for why the Eastern District abstained in *Peridot*: (1) all abstention doctrines rest on a concern about the conflicts between federal and state polices, and the question of whether the dormant Commence Clause applies to the interstate trade of cannabis presents a question of constitutional law which necessarily requires a court to delve into a serious conflict between these polices, see *Peridot*, 2020 WL 10629241, at *4-*7; (2) the purposes of the dormant Commerce Clause – to preserve national markets for goods and services – questionably applies to a market that the federal government has long-deemed illegal, *see id.* at *8; and (3) the plaintiff could not credibly request a federal court to exercise its legal or equitable powers to allow him to commit what is still considered a federal crime under the Controlled Substances Act, *see id.* at *9-*10.

Thus, if this matter were to proceed beyond the present Application seeking emergency relief, the Court would likely abstain based on the reasoning of *Peridot*, which the Court finds persuasive, or otherwise exercise its inherent authority to stay the proceeding pending a decision from the Ninth Circuit on the issues.  *See Landis v. N. Am. Co.,* 299 U.S. 248, 254 (1936) (stating the Supreme Court has long recognized that a district court possesses inherent power to stay proceedings "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants") (citation omitted); *Leyva v. Certified*

*Grocers of Cal., Ltd.*, 593 F.2d 857, 863-64 (9th Cir. 1979) ("A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case."). *But see Ne. Patients Grp.*, 45 F.4th 542.

Normally, this Court would not endeavor to forecast how it would rule on a particular issue were the matter to proceed at a normal litigation pace, nor would it be appropriate to do so in the ordinary course, but the *Winter's* test requires the Court to predict the likelihood of Plaintiffs' success on the merits. Therefore, this Court would be remiss in not pointing out the standing and abstention issues that would impact that probability. Accordingly, notwithstanding the serious questions Plaintiffs raise by their challenge under the Dormant Commerce Clause to the code provisions at issue, in light of the standing and abstention issues raised in this case, the Court seriously questions at this juncture the likelihood of a decision on the merits, let alone Plaintiffs succeeding on the merits in this federal suit.

For the sake of completeness, however, the Court will assume some likelihood of Plaintiffs' success on the merits and proceed to examine the remaining prongs of the *Winter* test for the requested emergency relief.

### 2. *Irreparable Harm*

Under the second prong of the *Winter* test, Plaintiffs have the burden of showing a "likelihood of irreparable injury—not just a possibility—in order to obtain preliminary relief." *Winter*, 555 U.S. at 21. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22 (citing *Mazurek*, 520 U.S. at 972).

Plaintiffs cite *American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009), to argue that an alleged violation of the Commerce Clause, coupled with damages, is sufficient to demonstrate irreparable harm. (App. at 18). However, the facts of that case are distinguishable. In *American Trucking*, a non-profit, national trade

1   association for the trucking industry sought to preliminary enjoin the implementation of
2   mandatory concession agreements for drayage trucking services at ports, arguing the
3   programs were preempted by the Federal Aviation Administration Authorization Act and
4   violated the Commerce Clause. *Id. Am. Trucking Ass'n, Inc.*, 559 F.3d at 1048. The Ninth
5   Circuit noted the plaintiffs in American Trucking Associations, Inc. were "being put to a
6   kind of Hobson's choice": either sign a likely unconstitutional agreement and incur costs
7   that could destroy their existing business, or refuse to sign the agreement and lose all of
8   their existing business. *Id.* at 1058. The Ninth Circuit concluded there was imminent and
9   irreparable harm because "a very real penalty [would attach] to the motor carriers
10  regardless of how they proceed[ed]." *Id.* In so holding, the Ninth Circuit focused on the
11  impact of the alleged violation of the Commerce Clause on the plaintiff's *existing* business.
12  *Id.*

13      Here, unlike *American Trucking*, Plaintiffs' argument that they will suffer
14  irreparable harm are based on their speculation that they would be able to successfully enter
15  the commercial retail cannabis market, establish a loyal customer base, and make a profit.
16  (*See* App. at 18-19). However, as discussed above, in light of the substantial deficiencies
17  in Plaintiff Gay's application for SEIA verification based on Verification Criteria that
18  Plaintiffs do not challenge, Plaintiffs' would not have been able to participate in the Lottery
19  and their chances of obtaining a license going forward were not guaranteed. Thus, unlike
20  *American Trucking*, the Plaintiffs' monetary losses associated with the challenged
21  provisions are purely speculative and insufficient to demonstrate irreparable harm. *See*
22  *also Cent. Ariz. Water Conservation Dist. v. United States Army Corps of Eng'rs*, No. CV-
23  18-00724-PHX-DLR, 2018 U.S. Dist. LEXIS 42703 (D. Ariz. Mar. 15, 2018) (finding that
24  plaintiff did not satisfy factor because "the [plaintiff's] allegations of harm are too
25  speculative.").

26      Moreover, Plaintiffs have not shown that any harm caused by their inability to
27  participate in today's Lottery is truly irreparable. According to Defendants, Plaintiff Gay
28  "may again request verification as a SEIA when the DCR opens a new verification window

1    [and] DCR anticipates opening a new SEIA verification period shortly after the P3RR2
2    Lottery is concluded." (Killeen Decl. ¶ 25). Additionally, after January 1, 2025, all
3    commercial cannabis application types will be available to all applicants, regardless of
4    whether they meet the SEIA verification requirements. *See* (*id.* ¶ 5). Thus, the probability
5    that Plaintiffs may in the future become eligible under the licensing provisions eviscerates
6    the likelihood of *irreparable* harm. Further, that Plaintiffs can seek monetary damages for
7    any alleged harm they have sustained due to lost opportunities in the interim contradicts an
8    argument that they will suffer irreparable harm from being excluded from the impending
9    Lottery and PCN process.

10                    3.    *Balance of Equities*

11          Here, the balance of the equities tips sharply against granting the relief requested in
12   Plaintiff's Application. According to the Defendants, there are 508 applicants who have
13   been awarded SEIA verification and are registered to participate in the Lottery. *See* Killeen
14   Decl. ¶ 12. Enjoining the Lottery at this late stage would potentially harm these applicants,
15   many of whom have invested significant resources into getting their cannabis businesses
16   running as soon as possible. *See e.g.*, Frierson Decl. ¶ 4-6. On the other hand, per Mr.
17   Killeen's declaration, "DCR anticipates it will hold a second retail lottery in early 2023 to
18   select an additional 75+ SEIAs to submit retail storefront applications." (Killeen Decl. ¶
19   22). Thus, Plaintiffs will have another opportunity, in the near future, to file for SEIA
20   Verification and potentially earn a commercial cannabis license even if an injunction is
21   denied. Therefore, the harms that those 508 individuals will suffer are undoubtedly more
22   substantial than the harms Plaintiffs claim that they will suffer if their Application is
23   denied. *See Cent. Ariz. Water Conservation Dist.*, 2018 U.S. Dist. LEXIS 42703, at *7-
24   *8.

25                    4.    *The Public Interest*

26          The last elements in the analysis is the public interest. Again, Plaintiffs fail to meet
27   their burden of demonstrating that moving forward with the Lottery and PCN process
28   would be in the public's interest. As set forth above, one of the central purposes behind

Proposition 64 was to preserve the authority of local governments to make their own polices regarding the proper distribution of commercial cannabis licenses. *See Peridot*, 2022 WL 10629241, at *5. Issuing an injunction would only thwart this goal, as Los Angeles has enacted a comprehensive regulatory scheme in furtherance of Proposition 64's mandate. Further, as stated previously, there are at least 508 other applicants whose rights would be adversely affected by an injunction halting the Lottery. Additionally, as Defendants point out, "the general public would not benefit from an injunction because the primary purpose of the Dormant Commerce Clause does not apply to federally illegal cannabis markets." (Opp. at 30). Accordingly, the public interest favors the denial of Plaintiff's Application.

## V.   CONCLUSION

For the all the foregoing reasons, the Court DENIES Plaintiffs' Application for Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue.

**IT IS SO ORDERED**

Dated: December 8, 2022

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE