1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| VARISCITE, INC. AND KENNETH GAY,<br><br>                              Plaintiff,<br><br>      v.<br><br>CITY OF LOS ANGELES; LOS ANGELES DEPARTMENT OF CANNABIS REGULATION; AND MICHELLE GARAKIAN,<br><br>                       Defendants. | Case No. 2:22-cv-08685-SPG-SK<br><br>**ORDER GRANTING, IN PART, DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO ABSTAIN [ECF No. 25]** |

Before the Court is City of Los Angeles', Los Angeles Department of Cannabis Regulation's, and Michelle Garakian's (collectively, "Defendants") motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, to abstain ("Motion"). (ECF No. 25 ("Mot.")). Having considered the parties' submissions, the relevant law, the record in this case, and the hearing on the Motion, the Court GRANTS, IN PART, Defendants' Motion. The case is STAYED pending the Ninth Circuit's decision

on Plaintiff Kenneth Gay's appeal in *Peridot Tree, Inc. v. City of Sacramento*, 22-16783 (9th Cir. Nov. 17, 2022), ECF No. 1 ("*Peridot Tree*").[1]

# I.    BACKGROUND

## A.    Factual Background

This order assumes the parties' familiarity with the regulatory background of this case, which is set forth in greater length in the Court's previous Order Denying Plaintiff's Application for Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue.  *See* (ECF No. 22 ("TRO Order")).  The factual allegations summarized here are drawn from Plaintiff's Complaint, (ECF No. 1 ("Compl.")), which are taken as true for purposes of Defendants' Motion.

### 1.    Los Angeles' SEIA Verification Criteria and the P3RR2 Lottery

The Complaint alleges as follows: Defendants are responsible for awarding storefront retail cannabis business licenses ("Licenses") for the City of Los Angeles through various processes.  *See* (*id.* ¶¶ 11–13).  The two processes that are relevant here are: (1) the Phase 3 Retail Round 2 Lottery ("P3RR2 Lottery"); and (2) the Public Convenience and Necessity ("PCN") process.  *See* (*id.* ¶ 13).  To participate in either process, an applicant must be at least 51% owned by an individual who has been verified as a "Social Equity Individual Applicant" ("SEIA") by Defendants.  *See* (*id.* ¶¶ 15, 28).  To be verified as a SEIA, an individual must submit evidence demonstrating satisfaction of

---

[1] "[A] court 'may take judicial notice of a documents filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'" *Eccher v. Mendoza-Powers*, No. CIV S-03-0020 GEB DAD P, 2007 WL 867985, at *15 (E.D. Cal. Mar. 19, 2007) (quoting *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994)); *San Luis & Delta-Mendota Water Auth. v. Badgley*, 136 F. Supp. 2d 1136, 1146 (E.D. Cal. 2000) ("Federal courts may 'take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue.'" (quoting *U.S. ex rel Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992)).  For this reason, the Court takes judicial notice of the existence and contents of the filed appeal in *Peridot Tree, Inc. v. City of Sacramento*, 22-16783 (9th Cir. Nov. 17, 2022), but not for the truth of the matters asserted in them.

two of the following three criteria ("Verification Criteria'): (a) a qualifying "California Cannabis Arrest or Conviction"; and (b)(1) 10 years of residency in a "Disproportionately Impacted Area," *or* (b)(2) "Low Income" status in the 2020 or 2021 calendar year. (*Id.* ¶ 15); *see also* L.A. Mun. Code § 104.20(b)(1)(i). The Los Angeles Municipal Code defines "California Cannabis Arrest or Conviction" to mean "an arrest or conviction in California for any crime under the laws of the State of California or the United States relating to the sale, possession, use, manufacture, or cultivation of Cannabis that occurred prior to November 8, 2016." (Comp. ¶ 16); *see also* L.A. Mun. Code § 104.20(b)(1)(ii)(3). The Los Angeles Municipal Code  defines "Disproportionately Impacted Area" ("DIA") to mean "Police Reporting Districts [("PRD")] as established in the Expanded Social Equity Analysis, or as established using the same methodology and criteria in a similar analysis provided by an Applicant for an area outside of the City."[2] (Compl. ¶ 17); *see also* L.A. Mun. Code § 104.20(b)(1)(ii)(4). Finally, the Los Angeles Municipal Code defines "Low Income" to mean that both of the following are met by the SEIA applicant: "(1) the [SEIA] meets  the  low-income threshold established in the annual U.S. Department of Housing and Urban Development (HUD) income limit based upon the Area Median Income (AMI) for Los Angeles County based on household size; and (2) the [SEIA] does not have Assets in excess of the amount as defined in this subsection."   L.A. Mun. Code § 104.20(b)(1)(ii)(5).

Defendants allowed individuals to apply to be verified as SEIA from May 26, 2022, to July 25, 2022. (Compl. ¶ 20). Defendants announced whether applicants were verified as SEIA by a website post on October 24, 2022. (*Id.*). That same day, Defendants opened the registration period for the P3RR2 Lottery. (*Id.* ¶ 21). The registration period for the P3RR2 Lottery remained open until November 23, 2022. (*Id.*). On approximately

---

[2] The Expanded Social Equity Analysis was a report prepared by consultants Wood Environment & Infrastructure Solutions, Inc. and presented to the Los Angeles City Council on May 27, 2020. (Compl. ¶ 18). This report identified as DIAs 151 PRDs in Los Angeles that have greater than the mean number of cannabis-related arrests for the City of Los Angeles and 60 percent or greater Low-Income thresholds. (*Id.*).

November 28, 2022, Defendants announced that the P3RR2 Lottery would take place on December 8, 2022. (*Id.* ¶ 22).

### 2. Plaintiff Gay's Rejected SEIA Application

Plaintiff Variscite, Inc. ("Variscite") is a corporation organized under the laws of the State of California, (*id.* ¶ 1), and Plaintiff Kenneth Gay is a citizen of Michigan (collectively, "Plaintiffs"), (*id.* ¶ 2). Gay applied to be verified as a SEIA for Variscite to participate in the P3RR2 Lottery. *See* (*id.* ¶¶ 22, 24). To show that he qualified as a SEIA, Gay submitted documentation to Defendants showing: (1) that he was convicted of a cannabis crime under Michigan law; (2) that he lived for more than ten years in an area the State of Michigan identified as a DIA; and (3) that he qualified as "Low Income." *See* (*id.* ¶ 24). The Complaint alleges that Plaintiff Gay "satisfie[d] all three requirements" to be verified as a SEIA, "except that the relevant events occurred in Michigan rather than California." (*Id.*).

On October 24, 2022, Plaintiffs learned that Defendants did not verify Gay as a SEIA. (*Id.* ¶ 25). Because Gay was not verified, Variscite was unable to participate in the December 8, 2022, P3RR2 Lottery. *See* (*id.* ¶ 26).[3] Plaintiff intends to apply for a license under Defendants' PCN process when the application opens. (*Id.* ¶ 34).

### B. Procedural History

On November 30, 2022, Plaintiffs filed a complaint against Defendants, asserting the following causes of action: (1) 42 U.S.C. § 1983, alleging that the P3RR2 Lottery violates the Dormant Commerce Clause of the United States Constitution, *see* (*id.* ¶¶ 35–39); (2) a Declaratory Judgment pursuant to 28 U.S.C. § 2201, requesting the Court declare that the P3RR2 Lottery violates the Dormant Commerce Clause of the United States Constitution, *see* (*id.* ¶¶ 40–42); (3) 42 U.S.C. § 1983, alleging that the PCN Process violates the Dormant Commerce Clause of the United States Constitution, *see* (*id.* ¶¶ 43–

---

[3] At the time of the Complaint's filing, on November 30, 2022, the P3RR2 Lottery had yet to be conducted. Defendants explain, and Plaintiffs do not dispute, that the City conducted the first iteration of the P3RR2 Lottery on December 8, 2022. (Mot. at 15).

47); and (4) a Declaratory Judgment, pursuant to 28 U.S.C. § 2201, requesting the Court declare that the PCN Process violates the Dormant Commerce Clause of the United States Constitution, *see* (*id.* ¶¶ 48–50) ("Complaint").  In essence, the Complaint assert that the Verification Criteria underlying both the P3RR2 Lottery and PCN process violates the dormant Commerce Clause because the criteria discriminates against non-California applicants.  *See* (*id.* ¶¶ 36, 37, 44, 45).

That same day, Plaintiffs filed an *ex parte* application for a preliminary injunction against Defendants ("*Ex Parte* Application").  (ECF No. 5 ("*Ex Parte* App.")).  The *Ex Parte* Application sought to prevent Defendants from holding the P3RR2 Lottery on December 8, 2022, and to prevent Defendants from processing any applications related to the Lottery.  (*Id.*).  The *Ex Parte* Application specifically argued that the SEIA Verification Criteria violated the Dormant Commerce Clause on the following grounds: (1) "California citizens are more likely than out-of-state citizens to have a California Arrest or California Conviction.  Thus, the ["California Cannabis Arrest or Conviction"] requirement favors California citizens over out-of-state [c]itizens"; and (2) by forcing out-of-state applicants to submit an analysis similar to that provided in the Expanded Social Equity Analysis to qualify as a DIA, Defendants have "set[] a requirement beyond the reach of potential [SEIAs] from outside of Los Angeles . . . ."  (*Id.* 15–17).

On December 8, 2022, the Court denied Plaintiffs' *Ex Parte* Application on multiple grounds.  (TRO Order).  The Court initially found that, based on the parties' submitted evidence for the *Ex Parte* Application, Plaintiffs lacked Article III standing because Plaintiffs "failed to demonstrate that their supposed constitutional injury was either caused solely by the challenged provisions of the Verification Criteria or that their injury is redressable by declaring the Verification Criteria unconstitutional because Plaintiffs' SEIA application was denied for failing to satisfy other *unchallenged* and independent SEIA Verification Criteria requirements."  (*Id.* at 11 (emphasis in original)).  This conclusion was premised on the following: (1) a declaration filed in support of the Defendants' opposition to the TRO, signed by Jason Killeen, Assistant Executive Director of the City

of Los Angeles' Department of Cannabis Regulation, who declared that, "[b]ased on the records submitted, [Plaintiffs] did not satisfy *any* of the Verification Criteria," *see* (*id.* at 11–12 (quoting (ECF No. 14-2 ¶ 16 ("Killeen Decl."))))); and (2) case law demonstrating that "[a] plaintiff challenging the validity of a statutory provision cannot establish either causation or redressability [for Article III standing] where another statutory provision not subject to challenge would cause the plaintiff to continue to suffer the same injury," *see* (*id.* at 10–11 (citing *Orion Wine Imps., LLC v. Appelsmith*, 837 Fed. Appx. 585 (9th Cir. 2021); *McConnell v. FEC*, 540 U.S. 93 (2003); *Nuclear Info. & Res. Serv. v. Nuclear Reg. Comm'n*, 457 F.3d 941 (9th Cir. 2006)).

As to the appropriateness of TRO relief, the Court also found that all four of the relevant TRO factors disfavored granting Plaintiffs' *Ex Parte* Application. *See* (*id.* at 13–26). The Court also explained that, in the wake of the Eastern District of California's decision in Plaintiff Kenneth Gay's separate but related case, *Peridot Tree, Inc. v. City of Sacramento*, No. 2:22-cv-00289-KJM-DB, 2022 WL 10629241 (E.D. Cal. Oct. 17, 2022) ("*Peridot Tree*"), there were serious questions as to whether this Court should abstain from exercising jurisdiction over this matter. *See* (*id.* at 18–23).

On January 6, 2023, Defendants filed the instant Motion. (Mot.). The Motion raises three arguments for why the Complaint should be dismissed: (1) because the Ninth Circuit has not applied the dormant Commerce Clause to local cannabis regulations, Plaintiffs' claims are precluded as a matter of law; (2) none of Los Angeles' SEIA criteria exclude out-of-state applicants or otherwise burden interstate commerce, and thus, do not violate the dormant Commerce Clause; and (3) Plaintiffs do not have standing to challenge the Social Equity Program because they cannot satisfy the unchallenged criteria to be verified as a SEIA. (*Id.* at 17–28). Alternatively, the Motion also argues that the Court should abstain from exercising jurisdiction over the case for three reasons: (1) under the *Pullman* Doctrine, the Court should allow the state court to render a determination as to whether Plaintiff Gay's application was sufficient under the City's criteria; (2) under the Eastern District of California's holding in *Peridot Tree*, this Court should abstain pursuant to the

general principles of federalism and comity; and (3) under the first-to-file rule, the Court should abstain until the Ninth Circuit Court of Appeals has rendered a decision on the *Peridot Tree* appeal. *See* (*id.* at 29–36).

Plaintiffs filed their opposition to the Motion on February 2, 2023. (ECF No. 26 ("Opp.")). Defendants filed their reply on February 8, 2023. (ECF No. 34 ("Reply")).

## II. LEGAL STANDARD

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). Dismissal is proper "when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013) (citation omitted). To survive a 12(b)(6) motion, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While a complaint does not need detailed factual allegations, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations and quotations omitted); *Ashcroft*, 556 U.S. at 678 ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). A plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016) (citation omitted).

### III.    DISCUSSION

Defendants' Motion raises two arguments for why Plaintiffs' Complaint should be dismissed before a ruling on its legal merits: (1) Plaintiffs lack Article III standing, *see* (Mot. at 25–28); and (2) the Court should abstain from exercising jurisdiction or issue a stay on this case pursuant to various abstention doctrines, including the first-to-file rule, *see* (*id.* at 28–36).

"[A] federal court has leeway to choose among threshold grounds for denying audience to a case on the merits." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (internal quotations and citation omitted). However, standing, unlike the issue of abstention, is a necessary element of federal-court jurisdiction. *See South Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency*, 625 F.2d 231 (9th Cir. 1980) (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "Only after a court is satisfied that standing and the other jurisdictional prerequisites are met may it determine, within its discretion, whether to abstain." *Id.* (citing *Miller-Davis Co. v. Illinois State Toll Highway Auth.*, 567 F.2d 323, 326 (7th Cir. 1977)). Thus, the Court addresses whether Plaintiff lacks Article III standing before determining whether abstention is appropriate.

### A.    Article III Standing

To invoke federal jurisdiction, Article III of the United States Constitution requires that there be a case or controversy. U.S. Const. art. III, § 2. The doctrine of standing, a part of the case-or-controversy requirement, is a fundamental prerequisite to obtaining any relief, equitable or otherwise, in federal courts. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Standing "focuses on the party seeking to get his complaint before a federal court and not on the issue he wishes adjudicated." *Flast v. Cohen*, 392 U.S. 83, 99 (1968). The "irreducible constitutional minimum" of Article III standing requires a plaintiff invoking federal jurisdiction to show that it has: (1) "suffered an injury in fact," (2) "that is fairly traceable to the challenged conduct of the defendant," and (3) "that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins (Spokeo II)*, 578 U.S. 330, 338 (2016) (citation omitted). "To establish injury in fact, a plaintiff must

show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan*, 504 U.S. at 560). The requirement of being fairly traceable to the challenged conduct stated another way means "there must be a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. For the injury to be redressable, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal quotations and citation omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561 (citations omitted).

In its TRO Order, the Court found that Plaintiffs had failed to satisfy the causation and redressability requirements under Article III standing because the unchallenged provisions of the Verification Criteria would "nevertheless inflict the same injury on Plaintiffs by barring [Plaintiff Gay's] SEIA verification and thus, a favorable ruling would still not remedy [Plaintiffs'] alleged injury." (TRO Order at 10). In doing so, the Court relied on the aforementioned Killeen Declaration to find that, "[b]ased on the records submitted [by Plaintiff Gay to Defendants during the SEIA application period], [Plaintiff Gay] did not satisfy *any* of the Verification Criteria." (*Id.* at 11 (quoting Killeen Decl. ¶ 16)) (emphasis in original). Here, Defendants request the Court take judicial notice of the previously filed Killeen Declaration in order to again argue that Plaintiffs lack Article III standing. *See* (Mot. at 25-28); (ECF No. 25-1).

However, a motion to dismiss presents a different posture than a motion for a temporary restraining order. When evaluating whether a TRO should be awarded, a court is permitted to consider materials outside of the complaint, including declarations, affidavits, and exhibits submitted in support of and in opposition to the application. *See Earth Island Inst. v. Nash*, No. 1:19-cv-01420-DAD-SAB, 2020 WL 1936701, at *6 (E.D. Cal. Apr. 21, 2020) ("[I]n considering a motion for a preliminary injunction, a court may consider and rely upon declarations, affidavits, and exhibits submitted by [both] parties." (citations omitted)); *Harper v. Poway Unified Sch. Dist.*, 345 F. Supp. 2d 1096, 1119–20

(S.D. Cal. 2004) (considering declarations submitted by defendants to deny plaintiff's request for a preliminary injunction); *BOKF, NA v. Estes*, 299 F. Supp. 3d 1117, 1122 (D. Nev. 2018). "The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984) (citations omitted). Thus, under this liberal standard, it was appropriate for the Court to consider the Killeen Declaration when it ruled on Plaintiffs' *Ex Parte* Application.

However, when reviewing a motion to dismiss, a court's inquiry is generally "limited to the contents of the [pleading], materials incorporated into the [pleading] by reference, and matters of which the court may take judicial notice." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). Although a court may take judicial notice of declarations previously filed in the matter pursuant to Federal Rule of Evidence 201, *see Weber Distrib., LLC v. RSUI Indem. Co.*, LA CV 17-09238 JAK (AGRx), 2018 U.S. Dist. LEXIS 225174, at *15 (C.D. Cal. Aug. 2, 2018) (taking judicial notice of previously filed declarations), a court should not do so on a motion to dismiss where the facts presented in those declarations are "subject to reasonable dispute." *See* Fed. R. Evid. 201(b); *see also Zhu v. Li*, Case No. 19-cv-02534, 2019 WL 6050961, at *4 (N.D. Cal. Nov. 15, 2019). A fact is "not subject to reasonable dispute" if it "is generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably questioned." Fed. R. Evid. 201(b)(1)–(2).

Per the Killeen Declaration, Mr. Killeen alleges that Plaintiff Gay "did not satisfy any of the Verification Criteria" because: (1) Gay did not submit sufficient documentation of a qualifying cannabis arrest or conviction; (2) Gay failed to fully disclose his assets or income to show that he qualifies as a "Low Income" applicant; and (3) Gay did not submit sufficient documentation of his residency in a DIA. (Killeen Decl. ¶ 16). As to the qualifying cannabis arrest or conviction requirement, Mr. Killeen declares that Plaintiff Gay's submitted documentation "does not appear to be an official government record," appears to be modified, and it was "unclear [from these documents] whether Mr. Gay's

arrest or conviction is, in fact, cannabis-related." (*Id.* ¶ 16(a)). As to the "Low Income" requirement, Mr. Killeen declares that Plaintiff Gay's documentation was incomplete because it failed to disclose various "material facts on his Asset Attestation Form." (*Id.* ¶ 16(b)). Finally, as to the cumulative residency requirement, Mr. Killeen declares that Plaintiff Gay neither submitted an analysis using the same methodology and criteria for an area outside of Los Angeles, nor submitted enough records to evidence 10 years of cumulative residency in any location. (*Id.* ¶ 16(c)).

Plaintiffs dispute the entirety of Mr. Killeen's factual assertions in their Opposition to the present Motion. *See* (Opp. at 18-25). In particular, Plaintiffs assert that the Killeen Declaration contains various factual misrepresentations as to the sufficiency of Plaintiff Gay's submitted documentation for the SEIA Verification and thus, said assertions should be disregarded for purposes of this Motion. *See* (*id.*). For example, as to the qualifying cannabis arrest or conviction requirement, Plaintiffs argue that: (1) contrary to Mr. Killeen's assertions, Plaintiff Gay "submitted two documents to evidence [a qualifying] cannabis conviction, both of which are official and unmodified: an Internet Criminal History Access Tool ('ICHAT') printout and a record of Discharge from Probation," (*id.* at 19); (2) if Mr. Killeen conducted an internet search, he would have seen that Plaintiff Gay's documentation is also found on a website which states that it "is the only public resource for name-based Michigan criminal history background checks" and thus, said documentation is a valid government record, *see* (Opp. at 19-20); and (3) Mr. Killeen could have confirmed that Plaintiff Gay's submitted documentation was not "modified" if he would have downloaded the documents, rather than print the document, *see* (*id.* at 20). Plaintiffs go on to dispute Mr. Killeen's assertion that Plaintiff Gay did not submit sufficient evidence showing that he has a qualifying conviction. (*Id.* at 20-21). Finally, Plaintiffs argue that Plaintiff Gay did submit sufficient documentation to satisfy the "Low Income" requirement and the residency requirement to be verified as a SEIA. *See* (Opp. at 21-25)

Based on the parties disagreements as to the veracity and sufficiency of Plaintiff Gay's SEIA documentation, the Court concludes the factual assertions contained therein, as well as in the Killeen Declaration, are "subject to reasonable dispute" because these assertions are neither "generally known" nor capable of being "accurately and readily determined from sources whose accuracy cannot be reasonably questioned." *See* Fed. R. Evid. 201(b).  In particular, neither party points to any objective criteria that would allow the Court to readily and accurately assess whether Plaintiff Gay's submitted documentation was sufficient to earn SEIA status.  Thus, for purposes of this Motion, the Court does not take judicial notice of the Killeen Declaration.  Instead, as it must on a Rule 12(b)(6) motion, the Court accepts as true the Complaint's allegation that Plaintiffs satisfied all requirements of the Verification Criteria.  (Compl. ¶ 24).  It thus follows based on those allegations that Plaintiffs have shown causation and redressability for purposes of Article III standing.

## B.    Abstention

Nevertheless, considering the ongoing appeal in *Peridot Tree*, the Court concludes that is appropriate to issue a stay of this case pending the Ninth Circuit's decision in those proceedings.   To explain the basis for its reasoning, the Court begins its discussion with the Controlled Substances Act and the growing legalization efforts surrounding commercial cannabis.  Then, the Court summarizes the facts and the Eastern District of California's decision in *Peridot Tree*.  Finally, the Court explains why the first-to-file rule is applicable to this case and, thus, why abstention is appropriate.

### 1.    The Controlled Substances Act and Commercial Marijuana

In 1969, President Richard Nixon declared a national "war on drugs." *Gonzales v. Raich*, 545 U.S. 1, 10 (2005).  "As the first campaign of that war, Congress set out to enact legislation that would consolidate various drug laws on the books into a comprehensive statute, provide meaningful regulation over legitimate sources of drugs to prevent diversion into illegal channels, and strengthen law enforcement tools against the traffic in illicit drugs." *Id.*  "That effort culminated in the passage of the Comprehensive Drug Abuse

Prevention and Control Act of 1970, 84 State. 1236." *Id.*   As part of that Act, Congress also enacted the Controlled Substances Act, 21 U.S.C. §§ 801–971 ("CSA").   The CSA created "a closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance" except as that law authorizes.   *Id.* at 13 (citing 21 U.S.C. §§ 841(a)(1), 844(a)).   More specifically, the CSA categorizes all controlled substances into five schedules "based on their accepted medical uses, the potential for abuse, and their psychological and physical effects on the body."   *Id.* at 13–14 (citing 21 U.S.C. §§ 811–12).   "Each schedule is associated with a distinct set of controls regarding the manufacture, distribution, and use of the substances listed therein."   *Id.* at 14 (citing 21 U.S.C. §§ 821–830).   The strictest regulations apply to controlled substances listed in "Schedule I," which Congress describes as those substances that have a "high potential for abuse, lack of any accepted medical use, and absence of any accepted safety for use in medically supervised treatment."   *Id.* (citing 21 U.S.C. § 812(b)(1).

Marijuana is a Schedule I drug.   21 US.C. § 812(c).   "By classifying marijuana as a Schedule I drug, as opposed to listing it on a lesser schedule, the manufacture, distribution, or possession of marijuana became a criminal offense, with the sole exception being use of the drug as part of a Food and Drug Administration preapproved research study."   *Raich*, 545 U.S. at 14 (citing 21 U.S.C. §§ 823(f), 841(a)(1), 844(a)).   "Virtually any marijuana transaction is unlawful under federal law: from possession to distribution to sales; even renting a room to someone 'for the purpose of' using marijuana is unlawful if done knowingly."   *Peridot Tree, Inc. v. City of Sacramento*, No. 2:22-cv-00289-KJM-DB, 2022 WL 10629241, at \*6 (E.D. Cal. Oct. 17, 2022) (citing 21 U.S.C. § 856(a) ("*Peridot Tree*").

Despite the CSA's criminal prohibition, cities and states have continued to authorize the sale of marijuana for medical and non-medical use throughout the United States.[4]   In

---

[4] To date, the following states and territories have legalized non-medical marijuana use: Alaska, Arizona, California, Colorado, Connecticut, the District of Columbia, Guam, Illinois, Maine, Maryland, Massachusetts, Michigan, Missouri, Montana, Nevada, New Jersey, New Mexico, New York, the Northern Mariana Islands, Oregon, Rhode Island,

doing so, many have adopted comprehensive licensing schemes regulating who is allowed to be a marijuana vendor in these markets. *See, e.g.*, *Attitude Wellness, LLC v. Vill. Of Pinckney*, 606 F. Supp. 3d 624, 629 (E.D. Mich. 2022) (discussing Village of Pinckney's point-based licensing scheme); *Finch v. Treto*, 606 F. Supp. 3d 818–19 (N.D. Ill. 2022) (discussing Illinois' point-based application system); *Lowe v. City of Detroit*, 544 F. Supp. 3d 804, 807–08 (E.D. Mich. 2021) (discussing Detroit's licensing scheme); *Toigo v. Dep't of Health & Senior Servs.*, 549 F. Supp. 3d 985, 990-96 (W.D. Mo. 2021) (discussing Missouri's licensing scheme); *Variscite NY One, Inc. v. State of N.Y.*, 1:22-cv-1013 (GLS/DJS), 2022 WL 17257900, at *1–3 (N.D.N.Y. Nov. 10, 2022) (discussing New York's licensing scheme); *NPG, LLC v. City of Portland, Me.*, Docket No. 2:20-cv-00208-NT, 2020 WL 4741913, at *2 (D. Me. Aug. 14, 2020) (discussing Portland's point-based licensing scheme); *Brinkmeyer v. Wash. Sate Liquor & Cannabis Bd.*, CASE NO. C20-5661 BHS, 2023 WL 1798173, at *2 (W.D. Wash. Feb. 7, 2023) (discussing Washington's licensing scheme); *Peridot Tree*, 2022 WL 10629241, at *1 (discussing City of Sacramento's licensing scheme). As stated previously, Los Angeles is one such city that authorizes the sale of marijuana for medical and non-medical use.

### 2. *Peridot Tree*

Like the City of Los Angeles, the City of Sacramento enacted its own licensing scheme in the wake of Proposition 64. *See Peridot Tree*, 2022 WL 10629241, at *1. Like Los Angeles' Social Equity Program, Sacramento's "Cannabis Opportunity Reinvestment and Equity" program's ("CORE") stated purpose was to reduce "barriers of entry and participation in the cannabis industry to those who have been negatively impacted by the disproportionate law enforcement of cannabis related crimes." *Id.* (internal quotations omitted). To participate in CORE, an applicant must fit within one of five defined

---

Vermont, Virginia, and Washington. *See Brinkmeyer v. Wash. State Liquor & Cannabis Bd.*, CASE NO. C20-5661 BHS, 2023 WL 1798173, at *1 n.2 (W.D. Wash. Feb. 7, 2023).

"classifications." *Id.* The following classifications were relevant to the Eastern District's decision:

> **Classification 1.** A current or former resident of the City of Sacramento who previously resided or currently resides in a low-income household and was either: a) arrested or convicted for a cannabis related crime in Sacramento between the years 1980 and 2011; or is b) an immediate family member of an individual described in subsection a of Classification 1 or Classification 2.

> **Classification 2.** A current or former resident of the City of Sacramento who has lived in a low-income household for at least five (5) years, between the years of 1980 and 2011 in [nine listed zip codes]:

*Id.* By their terms, both criteria required applicants to be current or former Sacramento residents. *Id.*

After Sacramento adopted the CORE program, it issued "storefront cannabis dispensary" permits to applicants. *Id.* Permits were awarded in a competitive process that weighed applicants' qualifications and their likely ability "to successfully apply for and operate a storefront dispensary." *Id.* Plaintiff Kenneth Gay – the very same plaintiff in this case – and, through a separate business entity called "Peridot Tree, Inc.," sought to participate in Sacramento's CORE program. *See id.* *2.

Sacramento refused Plaintiff Gay's request to participate in the CORE process because Plaintiff Gay was not a current or former resident of Sacramento. *See id.* Plaintiff Gay responsively filed suit in the Eastern District of California, arguing that the CORE program violated the dormant Commerce Clause to the United States Constitution. *Id.*

Invoking the doctrine of general abstention, the Eastern District abstained from exercising its jurisdiction over Plaintiff Gay's case and issued a stay of the proceedings. *Id.* at *11. The Eastern District acknowledged that Gay's case did "not fit neatly within any single abstention doctrine the Supreme Court has recognized." *Id.* at *4. Nevertheless, the Eastern District noted that the doctrines of abstention "are not 'rigid pigeonholes into which federal courts must try to fit cases,'" *id.* (quoting *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 12 n.9 (1987)); rather, they "overlap in a 'complex' web and are all 'designed to

soften the tensions inherent in a system that contemplates parallel judicial processes' in state and federal courts." *Id.* (quoting *Pennzoil Co.*, 481 U.S. at 12 n.9). With these doctrines in mind, the Eastern District concluded that "[a]bstention [was] the wisest court" because: (1) Plaintiff Gay's case presented difficult federal constitutional questions with significant implications for sensitive state policies; and (2) the case raised concerns about conflicting federal and state interests. *See id.* at *11.

On the first point, the Eastern District found "[t]he nature of . . . Gay's claim . . . rest[ed] on a shaky constitutional foundation." *Id.* at *7. In essence, Plaintiff Gay's case requested the Eastern District "to open Sacramento's borders to out-of-state marijuana sellers. But in passing the [CSA], Congress exercised its constitutional authority to pass laws necessary and proper to regulate Commerce . . . among the several States." *Id.* (internal quotations and citation omitted). By prohibiting "almost every aspect of the market for marijuana," the Eastern District noted that "Congress ha[d] effectively said there should be no interstate commerce in marijuana." *Id.* The Eastern District also found it "difficult to see what constitutional right a person could have to participate freely in illegal interstate marijuana markets." *Id.* at *8. After summarizing various cases that addressed the issue, the Eastern District concluded by stating: "[s]uffice it to say, the constitutional question is difficult and unsettled in federal courts across the country." *Id.*

On the second point, the Eastern District found that "federal and state policies collide at virtually every turn." *Id.* at *5. Regarding the issue of commercial cannabis, the Eastern District observed that California's interests demonstrably "loom[ed] large," stating:

> Proposition 64[5] includes a detailed explanation of its purposes, such as protecting children and the environment from the harms of a burgeoning illicit

---

[5] As explained in the Court's TRO Order: in the 2016 election, California voters adopted Proposition 64, the Control, Regulate and Tax Adult Use of Marijuana Act, 2016 Cal. Legis. Serv. Prop. 64 (west), legalizing in California certain activity involving the use of cannabis by persons 21 years of age or older. *People v. Raybon*, 11 Cal. 5th 1056, 1059, 1059 n.1 (2021). Subsequently, California enacted the Medicinal and Adult-Use Cannabis Regulation and Safety Act ("AUMA") "to establish a system to control and regulate the

drug market, . . . balancing state and local interests and preserving the authority of local governments to make their own policies and regulate land use, . . . recognizing the importance of public safety and private property rights and allowing employers to make their own workplace policies for marijuana, . . . alleviating 'pressure' on the state's courts, which were 'clogged with cases of non-violent drug offenses,' . . . resentencing defendants who would have received lesser punishment under the new regime, . . . generating tax revenue, opening legal markets, and closing illegal markets, . . . and [s]trengthen[ing] the state's existing medical marijuana system[.]

*Id.* (internal citations and internal quotations omitted).   Further, the court found Sacramento's interests also loomed large.  Sacramento had devoted its own resources to this new cannabis industry, and its city council explored how it could help those "who suffered disproportionately under the state's former criminal prohibitions and how it [could] help residents enter the newly legalized industry." *Id.* (citation omitted).  The court contrasted the policies of the United States, stating that, on the other hand, "[t]he United States' ambiguous marijuana enforcement policies [stood] in stark contrast with California's deliberate and extensive regulatory effort." *Id.* at *6.  As to the Legislative Branch, the Eastern District noted that "[s]ince December 16, 2014, congressional appropriations riders have prohibited the use of any [Department of Justice ("DOJ")] funds that prevent states with medical marijuana programs (including California) from implementing their state medical marijuana laws." *Id.* (quoting *United States v. Kleinman*, 880 F.3d 1020, 1027 (9th Cir. 2017).  And as to the Executive Branch, the court pointed out, "[o]fficials at the [DOJ] have also instructed field prosecutors that they should generally decline to enforce federal marijuana prohibitions in states like California, which permit marijuana distribution." *Id.* (citation and internal quotations omitted).

"Taking a step back," the Eastern District concluded that

cultivation, distribution, transport, storage, manufacturing, processing and sale of both medicinal and recreational cannabis."  L.A. Mun. Code § 104.00.   "The AUMA also provided for State licensing of commercial cannabis businesses, starting January 1, 2018. State law requires city approval in order to obtain a State License." *Id.*

[I]f this case were to proceed, the court would be forced to weigh in on a difficult constitutional dispute in which California's interests are clear and substantial: it has passed a wide-reaching and complex program designed to foster, regulate, and tax a new cannabis industry. The federal interests, by contrast, are murky: Congress has strictly and unambiguously prohibited all commerce in marijuana, but in recent years, the political branches have expressed no interest in enforcing that prohibition. The President has also called for a review of marijuana's classification on Schedule I. The constitutional right in question—the alleged right to a free-flowing interstate marijuana market—may also be a chimera; Congress has punished those who participate in that market with criminal liability.

These circumstances make a strong case for abstention. But there is yet another reason for caution. Several federal district courts have refused to "award profits from a business that grows, processes, and sells marijuana" in cases involving state law contract and similar claims. *Sensoria, LLC v. Kaweske*, No. 20-942, 548 F.Supp.3d 1011, 2021 WL 2823080, at *8 (D. Colo. July 7, 2021). Their reasoning is straightforward: "A federal court may not compel performance of an illegal contract and may not grant relief that would compel a party to violate federal law." *Sensoria, LLC v. Kaweske*, No. 20-00942, 2021 WL 103020, at *6 (D. Colo. Jan. 12, 2021); *see also Bassidji v. Goe*, 413 F.3d 928, 936 (9th Cir. 2005) (holding in case unrelated to marijuana that "courts will not order a party to a contract to perform an act that is in direct violation of a positive law directive, even if that party has agreed, for consideration, to perform that act").

Thus, the Eastern District abstained from the exercise of its jurisdiction over Plaintiff Gay's case, and issued a stay "to permit [Plaintiff Gay] to seek relief in a Claifornia court or administrative venue of competent jurisdiction or until such time as this court may award relief consistent with federal law." *Id.* at *11. On November 17, 2022, Plaintiff Gay (with Peridot Tree, Inc.) appealed the Eastern District's decision to the United States Court of Appeals for the Ninth Circuit. *See Peridot Tree, Inc. v. City of Sacramento*, 22-16783 (9th Cir. Nov. 17, 2022), ECF No. 1. That appeal remains pending.

### 3.   First-to-File Doctrine

Based on the above, Defendants argue that this Court should abstain from reaching the merits of this case pursuant to the first-to-file rule in order to allow the Ninth Circuit to decide the appeal in *Peridot Tree* first.  *See (*Mot. at 33-36).  The Court agrees.

"The first-to-file rule allows a district court to stay proceedings if a similar case with substantially similar issues and parties was previously filed in another district court." *Kohn Law Grp., Inc. v. Auto Parts Mfg. Miss., Inc.*, 787 F.3d 1237, 1239 (9th Cir. 2015).  The rule promotes federal comity by eliminating duplicative litigation and preventing the possibility of conflicting judgments.  *See Church of Scientology of Cal. v. U.S. Dep't of Army*, 611 F.2d 738, 750 (9th Cir. 1979) (citation omitted); *Certified Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 551 (6th Cir. 2007); *see also Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997).  Thus, the rule "should not be disregarded lightly." *Kohn Law Grp., Inc.*, 787 F.3d at 1239–40 (quoting *Alltrade, Inc. v. Uniweld Prods., Inc.*, 946 F.2d 622, 625 (9th Cir. 1991)) (internal quotations omitted).  Three factors are analyzed when deciding whether to apply the first-to-file rule: (1) chronology of the lawsuits; (2) similarity of the parties; and (3) similarity of the issues. *Kohn Law Grp., Inc.*, 787 F.3d at 1240.  If these factors are satisfied, the court of the later-filed action "should defer to the jurisdiction of the court of the first-filed action by either dismissing, staying, or transferring the later-filed suit." *Molander v. Google LLC*, 473 F. Supp. 3d 1013, 1017 (N.D. Cal. 2020) (citation omitted).  Importantly, "[t]he first-to-file rule is neither rigid nor inflexible and should be applied with the consideration of sound judicial administration in mind." *Thompson v. United States*, Case No. 22-cv-05544-TSH, 2023 WL 2311968, at *2 (N.D. Cal. Feb. 28, 2023) (citing *Pacesetter Sys. Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94–95 (9th Cir. 1982)).   "Because disciplined and experienced judges are given ample discretion in deciding to apply the first-to-file rule, *Alltrade, Inc.*, 946 F.2d at 628, a court should thus strive to 'maximize economy, consistency, and comity.'" *Id.* (quoting *Kohn Law Grp., Inc.*, 787 F.3d at 1240).

i.     *Chronology of the Two Actions*

The first factor simply requires that the case in question be filed later in time than the comparator case. *Kohn Law Grp., Inc.*, 787 F.3d at 1240; *Nextgen Leads LLC v. Gen3ventures, LLC*, Case No.: 21cv1001 DMS (MSB), 2021 WL 4942673, at *3 (S.D. Cal. Oct. 22, 2021) (citing *Therapy Stores, Inc. v. JGV Apparel Grp., LLC*, No. 4:16-CV-02588-YGR, 2016 WL 4492583, at *4 (N.D. Cal. Aug. 26, 2016)).  This case was filed on November 30, 2022, (Compl.), and the original complaint in *Peridot Tree* was filed on February 14, 2022, Complaint, *Peridot Tree, Inc. v. City of Sacramento*, 2:22-cv-00289-KJM-DB (E.D. Cal. Feb. 14, 2022), ECF No. 1.[6]  Because this case was filed after *Peridot Tree*, the first factor is satisfied.  *See Alltrade*, 946 F.2d at 624–25 (holding that the first factor "clearly ha[d] been met" because the defendant in the second-filed action "filed its suit [one day] prior to [the plaintiff's]"); *Agri-Systems v. W. Nat'l Assur. Co.*, No. 20-cv-00044, 2020 WL 6781685, at *3 (D. Mont. Nov. 18, 2020) ("The first-to-file rule simply requires a chronology of the actions. . . .  Here, Western National filed the Minnesota Action before ASI filed this lawsuit, albeit by only a few hours." (simplified)); *Kokusai Semiconductor Equip. Corp. v. ASM Int'l, N.V.*, No. 3:18-cv-00323-AC, 2019 WL 1281290, at *4 (D. Or. Jan. 25, 2019) ("[Plaintiffs] filed . . . the California action on December 1, 2017, contending that [the defendant]'s products infringe seven patents. Plaintiffs filed this action on February 20, 2018, asserting [the defendant]'s products are infringing an additional four patents.  Thus, the California action was filed before the Oregon action, and the first prong supports applying the first-to-file rule."), *findings and recommendation adopted*, 2019 WL 1281228, at *1–2 (D. Or. Mar. 20, 2019)).

---

[6] As previously discussed, the Court may take judicial notice of filings in other courts to establish the fact of such litigation and related filings.  *Supra* note 1.  For this reason, the Court takes judicial notice of the original complaint and all other related filings in the Eastern District's proceedings in *Peridot Tree*.

1

ii.     *Similarity of the Parties*

2

"Courts in the Ninth Circuit have adopted a flexible approach in evaluating the

3

similarity of the parties . . . ."  *PETA, Inc. v. Beyond the Frame, Ltd.*, No. CV 10-07576

4

MMM SSX, 2011 WL 686158, at *2 (C.D. Cal. Feb. 16, 2011) (citation omitted).  Thus,

5

this factor does not require exact identity of the parties.  *Kohn Law Grp., Inc.*, 787 F.3d at

6

1240 (citations omitted).  Instead, it "requires only substantial similarity of parties."  *Id.*

7

(citations omitted).  Courts have found parties to be "substantially similar" under the first-

8

to-file rule "if they represent the same interests."  *Miller Mendel Inc., et al. v. Alaska State*

9

*Troopers, et al.*, No. 3:21-cv-0129-HRH, 2021 WL 3698377, at *3 (D. Alaska Aug. 19,

10

2021) (quoting *Aqua Connect, Inc. v. SHI Int'l Corp.*, Case No. CV 19-05662-AB (JPR),

11

2019 WL 8883452, at *3 (C.D. Cal. Dec. 16, 2019)).

12

Although *Peridot Tree* and this case share Plaintiff Kenneth Gay, they do not contain

13

identical plaintiffs and defendants.  On the plaintiffs' side, the complaint in this action

14

names Variscite, Inc. as co-plaintiff, while the first amended complaint in *Peridot Tree*

15

names Peridot Tree, Inc.  *See Peridot Tree, Inc. v. City of Sacramento*, Case No. 2:22-cv-

16

00289-KJM-DB (E.D. Cal. Mar. 28, 2022), ECF No. 12.  On the defendants' side, this case

17

names the City of Los Angeles, Los Angeles Department of Cannabis Regulation, and

18

Michelle Garakian to the action, while the first amended complaint in *Peridot Tree* names

19

the City of Sacramento and Devina Smith, Manager of the Sacramento Office of Cannabis

20

Management.  *Id.*  Despite these differences, the Court concludes that that this factor is

21

satisfied.

22

As previously discussed, the Ninth Circuit has applied this factor flexibly to promote

23

federal comity and judicial efficiency.  Thus, courts within the Circuit have found this

24

factor satisfied where there is at least *some* overlap between the parties, as opposed to being

25

completely identical.  *See, e.g.*, *Pac. Coast Breaker, Inc. v. Conn. Elec., Inc.*, Civ. No. 10-

26

3134 KJM EFB, 2011 WL 2073796, at *3 (E.D. Cal. May 24, 2011) ("[E]xact identity is

27

not required to satisfy the first-to-file rule.  The rule is satisfied if *some* [of] the parties in

28

one matter are also in the other matter, regardless of whether there are additional,

unmatched parties in one or both matters." (quoting *PETA, Inc.*, 2011 WL 686158, at *2 (emphasis added))); *Dang v. Pontier*, Case No.: 19CV1519-GPC(AHG), 2020 WL 7481312, at *3 (S.D. Cal. Dec. 18, 2020) (finding factor satisfied because both cases shared common plaintiff and some defendants); *Thomas v. Imperial Indus. Supply Co.*, CIV NO. 20-00282 LEK-RT, 2020 WL 6304164, at *3 (D. Haw. Oct. 27, 2020).  And here, this case and *Peridot Tree* overlap with the presence of Plaintiff Kenneth Gay.

The Court also finds that the remaining non-overlapping defendants are advancing substantially similar interests.  On the plaintiffs' side, Variscite and Peridot Tree, Inc. are both business entities created by Plaintiff Gay that are pursuing their respective legal actions to gain access to the commercial cannabis licensing market in their respective California cities.  On the defendants' side, the City of Los Angeles, Los Angeles Department of Cannabis Regulation, Michelle Garakian, the City of Sacramento, and Devina Smith are all public entities/public officials defending their respective commercial cannabis licensing schemes, created in the wake of California's Proposition 64, against the same Plaintiff Kenneth Gay who alleges that their licensing schemes violate the dormant Commerce Clause.  *See Miller Mendel Inc. v. Alaska State Troopers*, No. 3:21-cv-0129-HRH, 2021 WL 3698377, at *3 (D. Alaska Aug. 19, 2021) (finding factor satisfied, despite there being no overlap between the cases' defendants, because "the defendants in both cases arguably represent the same interests in that they all (1) seek to invalidate the Patent[]-In Suit, (2) seek a finding of non-infringement of th[at] patent[], and (3) [purchased] the exact same accused product[]."").  For these reasons, the Court finds this second factor is also satisfied.

### iii.    Similarity of the Issues

Courts within the Ninth Circuit have also adopted a "flexible approach" in evaluating the similarity of the issues factor.  *PETA, Inc.*, 2011 WL 686158, at *2 (citations omitted).  Thus, "[t]he issues in both cases need not be identical, only substantially similar."  *Kohn Law Grp., Inc.*, 787 F.3d at 1240–41 (citations omitted).  "To determine whether two suits

involve substantially similar issues, [the court] looks at whether there is 'substantial overlap' between the two suits." *Id.* (citing *Harris Cnty. v. Carmax Auto Superstores, Inc.*, 177 F.3d 306, 319 (5th Cir. 199)).

The present case and *Peridot Tree* involve not only substantially similar issues, but *identical* issues. Each case asks whether federal courts can enforce the dormant Commerce Clause in the context of federally illegal markets; in particular, the market for commercial marijuana. In doing so, each case also asks whether the federal courts are an appropriate forum to answer this question in the first place, given the general principles found in our abstention doctrines.

With all three factors satisfied, the Court finds the first-to-file rule to be appropriately applied in this case. To reach this case's merits, at this time, would be an inefficient use of this Court's resources and could potentially threaten federal comity between itself and the Eastern District of California.[7] These concerns are particularly heightened where, as here, an appeal is currently pending in the Ninth Circuit that is likely to address one (or both) of the core issues to be decided in this case.[8] However, the Court does not completely abstain from exercising jurisdiction over the matter. Because this case and *Peridot Tree* deal with related but separate city licensing schemes, the Court merely stays this case pending the outcome of Plaintiff Gay's appeal in *Peridot Tree*.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion is GRANTED IN PART. The Court STAYS this case pending the Ninth Circuit's decision on Plaintiff Kenneth Gay's appeal in *Peridot Tree*. *Peridot Tree, Inc. v. City of Sacramento*, 22-16783 (9th Cir. Nov. 17, 2022), ECF No. 1. The parties are ORDERED to file a report outlining the status of the Ninth Circuit litigation WITHIN 180 DAYS of this order.

---

[7] *Cf. Brinkmeyer*, 2023 WL 1798173, at *6–14.

[8] The Court separately notes that it would also abstain on the same grounds found in *Peridot Tree*. *See* 2022 WL 10629241, at *3-11.

1

**IT IS SO ORDERED**

2

3    Dated: April 11, 2023

4
                                        _____
5                                       HON. SHERILYN PEACE GARNETT
                                        UNITED STATES DISTRICT JUDGE
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28